**07-4781-cv**
**Buy Rite, Inc. v. Boyle**

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

————

August Term, 2008

(Argued: January 20, 2009                               Decided: July 1, 2009)

Docket No. 07-4781-cv

————

ARNOLD'S WINES, INC., D/B/A/ KAHN'S FINE WINES & SPIRITS, BUY RITE, INC., DOING BUSINESS AS CROWN LIQUORS, JOSHUA T. BLOCK, SHARON SILBER,

*Plaintiffs-Appellants*,

—v.—

DANIEL B. BOYLE, CHAIRMAN OF THE NEW YORK STATE LIQUOR AUTHORITY, IN HIS OFFICIAL CAPACITY, LAWRENCE J. GEDDA, COMMISSIONER OF THE DIVISION OF ALCOHOLIC BEVERAGE CONTROL, IN HIS OFFICIAL CAPACITY, NEW YORK STATE LIQUOR AUTHORITY,

*Defendants-Appellees*,

EBER BROTHERS WINE & LIQUOR CORP., CHARMER INDUSTRIES, INC., METROPOLITAN PACKAGE STORE ASSOCIATES, INC.,

*Intervenor-Defendants-Appellees*.

————

Before:
WALKER, CALABRESI, and WESLEY, *Circuit Judges*.

Appeal from an order of the United States District Court for the Southern District of New York (Holwell, J.), entered on October 1, 2007, granting defendants' motions to dismiss

1

Appellants' request for a declaratory judgment invalidating sections 100(1), 102(1)(a), and 102(1)(b) of New York's Alcoholic Beverage Control Law as violative of the Commerce Clause of the United States Constitution, Article I, Section 8, Clause 3.

AFFIRMED.

———————

PETER E. SEIDMAN, Milberg LLP, New York, NY, (Sanford P. Dumain, Milberg LLP, New York, NY, James A. Tanford, Indiana Univ. School of Law, Bloomington, IN, and Robert D. Epstein, Epstein Cohen Donahoe & Mendes, Indianapolis, IN, *of counsel*), *for Plaintiffs-Appellants.*

RICHARD P. DEARING, Assistant Solicitor General (Barbara D. Underwood, Solicitor General, and Michael S. Belohlavek, Senior Counsel, Division of Appeals & Opinions, *of counsel*), *for* Andrew M. Cuomo, Attorney General of the State of New York, New York, NY, *for Defendants-Appellees.*

JOHN F. O'MARA, Davison & O'Mara, P.C., Elmira, NY (Harris Beach PLLC, Pittsford, NY, *of counsel*), *for Intervenor-Defendant-Appellee Eber Bros. Wine & Liquor Corp.*

HOWARD GRAFF, Dickstein Shapiro LLP, New York, NY, *for Intervenor-Defendant-Appellee Charmer Industries, Inc.*

ALAN J. GARDNER, Verini & Gardner, New York, NY, *for Intervenor-Defendant-Appellee Metropolitan Package Store Association, Inc.*

SARAH L. OLSON, Wildman, Harrold, Allen & Dixon, LLP, Chicago, IL (Richard Harrison, Westerman Ball Ederer Miller & Sharfstein, LLP, Mineola, NY, *of counsel*), *for* Arthur J. DeCelle, Executive Vice President and General Counsel of the Beer Institute, Washington, D.C., *for Amicus Curiae The Beer Institute.*

ANTHONY S. KOGUT, Willingham & Coté, P.C., East Lansing, MI, *for Amicus Curiae The American Beverage Licensees Association.*

CARTER G. PHILLIPS, Sidley Austin LLP, Washington, D.C. (Jacqueline G. Cooper, Sidley Austin, LLP, Washington D.C., Craig Wolf, Joanne Moak, and Karin Moore, Wine & Spirits Wholesalers of America, Inc.,

Washington, D.C., *of counsel*), *for Amici Curiae Wine & Spirits Wholesalers of America, Inc., National Beer Wholesalers Association, and Sazerac Company*.

—————

WESLEY, *Circuit Judge*:

This case asks us to chart a course between two constitutional provisions that delineate the boundaries of a state's power to regulate commerce, one an express grant, the other an implied limitation. Section 2 of the Twenty-first Amendment provides: "The transportation or importation into any State, Territory, or possession of the United States for delivery or use therein of intoxicating liquors, in violation of the laws thereof, is hereby prohibited." U.S. Const. amend. XXI, § 2. The Commerce Clause reserves for Congress the power "[t]o regulate Commerce . . . among the several States," thus implicitly limiting the states' power to do so. U.S. Const. art. 1, § 8, cl. 3. Here, we must determine whether New York's alcohol regulatory regime is properly within the scope of section 2 of the Twenty-first Amendment, such that it does not run afoul of the dormant Commerce Clause. We conclude that the challenged regime is permissible under the Twenty-first Amendment insofar as it requires that all liquor sold within the State of New York pass through New York's three-tier regulatory system.

## BACKGROUND

Appellant Arnold's Wines, Inc., doing business as Kahn's Fine Wines & Spirits, a wine retailer operating two stores in the Indianapolis, Indiana area, would like to sell its products directly to New York consumers. Appellants Joshua T. Block and Sharon Silber, New York

3

residents, would like to be able to buy and receive wine directly from out-of-state retailers.

Appellants thus brought this action in the United States District Court for the Southern District of New York against the New York State Liquor Authority and individual officials of the New York State Liquor Authority, pursuant to 42 U.S.C. § 1983, seeking a declaratory judgment finding sections 100(1), 102(1)(a), and 102(1)(b) of New York's Alcoholic Beverage Control Law ("ABC Law") unconstitutional to the extent that they prohibit out-of-state wine retailers from selling and delivering wine directly to New York consumers. Two licensed New York wholesalers and an association of licensed New York retailers were granted leave to appear as intervenor-defendants.

The district court (Holwell, J.), in a well-reasoned decision, granted defendants' motion to dismiss, holding that the challenged sections are an integral part of the three-tier alcohol regulatory system consistent with the authority granted to New York by the Twenty-first Amendment. *Arnold's Wines, Inc. v. Boyle*, 515 F. Supp. 2d 401, 413-14 (S.D.N.Y. 2007). Appellants timely filed this appeal.

*A.      New York's Regulatory Scheme*

Sections 100(1), 102(1)(a), and 102(1)(b) of New York's ABC Law require that all liquor sold, delivered, shipped, or transported to a New York consumer first pass through an entity licensed by the State of New York. Section 100(1) states, "No person shall manufacture for sale or sell at wholesale or retail any alcoholic beverage within the state without obtaining the appropriate license therefor required by this chapter." N.Y. Alco. Bev. Cont. Law § 100(1)

4

(McKinney 2000 & Supp. 2006).[1]  The other two provisions make it illegal to ship alcoholic beverages to an unlicensed entity within the state (i.e., a consumer).  *Id.* § 102(1)(a)-(b).

These provisions are part of the three-tier licensing structure for the sale and distribution of alcoholic beverages established in New York shortly after the passage of the Twenty-first Amendment.  The main purpose of the three-tier system was to preclude the existence of a "tied" system between producers and retailers, a system generally believed to enable organized crime to dominate the industry.  The three tiers are: (1) the producer, (2) the distributor or wholesaler, and (3) the retailer.  Under this system, the producer sells to a licensed in-state wholesaler, who pays excise taxes and delivers the alcohol to a licensed in-state retailer.  The retailer, in turn, sells the alcohol to consumers, collecting sales taxes where applicable.  In New York, only in-state and out-of-state wineries may bypass the three-tier system to ship directly to consumers.  *Id.* §§ 79-c, 79-d.  All other out-of-state producers and sellers must ship to state-licensed wholesalers within the three-tier system.  *Id.* § 102(1)(a)-(b); *see also Arnold's Wines*, 515 F. Supp. 2d at 403-04.

This licensing scheme allows the state to oversee the financial relationships among manufacturers, wholesalers, and retailers, *see* N.Y. Alco. Bev. Cont. Law §§ 101, 105(16)-(17), 106(13)-(14), as well as the ways these entities price goods and make sales, *see id.* §§ 101-aa, 101-b(2)-(3).  The State Liquor Authority may inspect any premises where alcoholic beverages

---

[1]  With the exception of wineries, *see id.* §§ 79-c, 79-d, all manufacturers' products must pass through the three-tier system.  Manufacturers operating within the State of New York are required to obtain a license granted by the state, as well as distribute their products through licensed wholesalers and retailers.  *See id.* §§ 100(1), 100(2).  Manufacturers operating outside of the state, and therefore not licensed by the state, similarly must ship their products to a licensed in-state wholesaler or retailer for resale to New York consumers.  *See id.* §§ 100(2), 102(1).

are manufactured, stored, or sold, as well as the books and records kept on such premises. *Id.* §§ 18(4), 103(7), 104(10), 105(15), 106(12). New York asserts that the three-tier regulatory system allows the state to collect taxes more efficiently and prevent the sale of alcohol to minors.

Relevant in this particular case, New York-licensed retailers, the final tier in the state's three-tier system, may obtain off-premises licenses permitting them to deliver alcohol directly to consumers' homes "in vehicles owned and operated by such licensee[s], or hired and operated by such licensee[s] from a trucking or transportation company registered with the liquor authority." *Id.* § 105(9). New York retail off-premises licensees must comply with a set of highly detailed regulations governing the location, physical characteristics, and operating hours of their premises, as well as their financial relationships with producers and wholesalers, and the manner in which they keep books and records for all their transactions. *Id.* § 105(1)-(23). Out-of-state retailers without an in-state operation cannot obtain a New York retail off-premises license. It is this distinction–that New York-licensed retailers, but not out-of-state retailers, may deliver liquor directly to New York residents–that Appellants challenge in this case.

## DISCUSSION

Appellants argue that New York's ban on direct sales to consumers by out-of-state liquor retailers discriminates against interstate commerce and thus violates the Commerce Clause. The Commerce Clause provides that Congress has the power to "regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes." U.S. Const. art. I § 8, cl.3. It is well established that the affirmative implies the negative, and that the Commerce Clause

6

establishes a "dormant" constraint on the power of the states to enact legislation that interferes with or burdens interstate commerce. *See, e.g.*, *Dennis v. Higgins*, 498 U.S. 439, 447 (1991). Thus, states may not pass laws that discriminate against out-of-state economic interests unless those laws "advance[] a legitimate local purpose that cannot be adequately served by reasonable nondiscriminatory alternatives." *New Energy Co. of Ind. v. Limbach*, 486 U.S. 269, 278 (1988).

However, the Supreme Court has made clear that the Twenty-first Amendment alters dormant Commerce Clause analysis of state laws governing the importation of alcoholic beverages. *E.g.*, *Granholm v. Heald*, 544 U.S. 460, 488-89 (2005). Ratified in 1933, the Twenty-first Amendment repealed the Eighteenth Amendment and ended Prohibition. Section 2 of the Amendment provides: "The transportation or importation into any State, Territory, or possession of the United States for delivery or use therein of intoxicating liquors, in violation of the laws thereof, is hereby prohibited." The purpose of section 2 was to protect certain core interests of the states in "promoting temperance, ensuring orderly market conditions, and raising revenue" through regulation of the production and distribution of alcoholic beverages. *North Dakota v. United States*, 495 U.S. 423, 432 (1990) (plurality opinion).

The Twenty-first Amendment is thus in tension with the Commerce Clause, as section 2 "grants the States virtually complete control over whether to permit importation or sale of liquor and how to structure the liquor distribution system." *Granholm*, 544 U.S. at 488 (quoting *Cal. Retail Liquor Dealers Ass'n v. Midcal Aluminum, Inc.*, 445 U.S. 97, 110 (1980)) (internal quotation marks omitted). But state powers under the Twenty-first Amendment are not without limitation; the Amendment does not immunize all regulation of alcoholic beverages from

Commerce Clause scrutiny. *Id.* State policies are only "protected under the Twenty-first Amendment when they treat liquor produced out of state the same as its domestic equivalent." *Id.* at 489.

Most recently, in *Granholm v. Heald*, the Supreme Court addressed the difficulties inherent in the intersection of these two constitutional provisions. Analyzing the Wilson Act and the Webb-Kenyon Act–two pre-Prohibition statutes that influenced the drafting of section 2 of the Twenty-first Amendment–the Court concluded that section 2's purpose was to return to the states only the Commerce Clause immunity provided by those two Acts. *Id.* at 483. The Twenty-first Amendment was intended "to allow States to maintain an effective and uniform system for controlling liquor by regulating its transportation, importation, and use. The Amendment did not give States the authority to pass nonuniform laws in order to discriminate against out-of-state goods." *Id.* at 484-85.

The *Granholm* Court set forth the test for determining the constitutionality of state liquor regulations. If the state measure discriminates in favor of in-state producers or products, the regulatory regime is not automatically saved by the Twenty-first Amendment simply by virtue of the special nature of the product regulated. *See id.* at 484-87. Rather, if the court finds the law discriminatory, it will only be upheld if it reasonably advances legitimate state interests "that cannot be adequately served by reasonable nondiscriminatory alternatives." *Id.* at 489 (quoting *Limbach*, 486 U.S. at 278) (internal quotation marks omitted).

Applying this framework, the *Granholm* Court struck down laws in New York and Michigan that created exceptions to the states' three-tier distribution systems, allowing in-state

8

wineries to bypass the three tiers and ship directly to consumers, while preventing out-of-state wineries from doing so. *Id.* at 466. The Court found that the "differential treatment requir[ing] all out-of-state wine, but not all in-state wine, to pass through an in-state wholesaler and retailer before reaching consumers" impermissibly discriminated against interstate commerce. *Id.* at 473-74; *see also id.* at 467. Thus, the Court found that the New York and Michigan laws were not immunized by the Twenty-first Amendment.

Having concluded that the challenged laws were not authorized by the Twenty-first Amendment, the *Granholm* Court next undertook the standard dormant Commerce Clause analysis, determining whether the discriminatory statutes served a legitimate local purpose that could not be accomplished through nondiscriminatory means. *See id.* at 489. The Court noted that there were a number of nondiscriminatory practices by which the states could achieve their stated goals of facilitating tax collection and preventing minors from consuming alcohol. *See id.* at 489-93. Accordingly, it struck down the New York and Michigan laws as violative of the Commerce Clause. *Id.* at 493.

In reaching its conclusion, the Court repeatedly emphasized that the three-tier systems in place in both states did not themselves violate the Constitution. Specifically, the Court stated that it is "unquestionably legitimate" for a state to bar the importation of alcoholic beverages if it bans the sale and consumption of alcohol altogether, or to "funnel sales through the three-tier system." *Id.* at 489. *Granholm* is best seen as an attempt to harmonize prior Court holdings regarding the power of the states to regulate alcohol within their borders–a power specifically granted to the states by the Twenty-first Amendment–with the broad policy concerns of the

9

Commerce Clause. *See, e.g.*, *North Dakota*, 495 U.S. at 432; *Capital Cities Cable, Inc. v. Crisp*, 467 U.S. 691, 712-13 (1984); *Midcal*, 445 U.S. at 110. *Granholm* validates evenhanded state policies regulating the importation and distribution of alcoholic beverages under the Twenty-first Amendment. It is only where states create discriminatory exceptions to the three-tier system, allowing in-state, but not out-of-state, liquor to bypass the three regulatory tiers, that their laws are subject to invalidation based on the Commerce Clause. *Granholm*, 544 U.S. at 489; *see also Brooks v. Vassar*, 462 F.3d 341, 351-53 (4th Cir. 2006).

A. *Application of the* Granholm *Analysis to New York's ABC Law*

Appellants challenge provisions that make no distinction between liquor produced in New York and liquor produced out of the state: both may be shipped directly to New York consumers by licensed in-state retailers. *See Granholm* 544 U.S. at 487; *Healy v. Beer Inst.*, 491 U.S. 324, 335-37 (1989); *Brown-Forman Distillers Corp. v. N. Y. State Liquor Auth.*, 476 U.S. 573, 582-83 (1986); *Bacchus Imports, Ltd. v. Dias*, 468 U.S. 263, 276 (1984). Appellants seek to mimic the concerns addressed in *Granholm* by contending that the New York law is invalid because it grants in-state retailers benefits not afforded to out-of-state retailers. This argument comes up short under *Granholm* for several reasons.

First, because in-state retailers make up the third tier in New York's three-tier regulatory system, Appellants' challenge to the ABC Law's provisions requiring all wholesalers and retailers be present in and licensed by the state, N.Y. Alco. Bev. Cont. Law § 100(1), is a frontal attack on the constitutionality of three-tier system itself. However, the *Granholm* Court specifically acknowledged the vital role of the three-tier system in the exercise of states' section

10

powers. The Court reaffirmed that the three-tier system is an "unquestionably legitimate" exercise of the states' powers under the Twenty-first Amendment to regulate the importation and use of alcohol. *Granholm*, 544 U.S. at 488-89.[2] Appellants' argument is therefore directly foreclosed by the *Granholm* Court's express affirmation of the legality of the three-tier system.

Appellants reply that the language in *Granholm* endorsing the three-tier system is merely dicta. In *Granholm*, the states explicitly argued that the challenged regulations were essential elements of the three-tier system. They attempted to justify their regulations by citing prior Supreme Court cases that acknowledged the three-tier system as a legitimate exercise of state power under the Twenty-first Amendment. In reaching its holding, the *Granholm* Court noted that the challenged regulations were discriminatory exceptions to, rather than integral parts of, the underlying three-tier systems. *See id.* Had the three-tier system itself been unsustainable under the Twenty-first Amendment, the *Granholm* Court would have had no need to distinguish it from the impermissible regulations at issue. As Judge Holwell stated in his opinion below, "if dicta this be, it is of the most persuasive kind." *Arnold's Wines*, 515 F. Supp. 2d at 412.

Second, New York's ABC Law treats in-state and out-of-state liquor evenhandedly under the state's three-tier system, and thus complies with *Granholm*'s nondiscrimination principle.

---

[2] The *Granholm* dissenters specifically endorsed the constitutionality of the three-tier system as well. *Id.* at 495 (Stevens, J., dissenting) ("Can it be doubted that a State might establish a state monopoly of the manufacture and sale of beer, and either prohibit all competing importations, or discourage importation by laying a heavy impost, or channelize desired importations by confining them to a single consignee?" (quoting *State Bd. of Equalization of Cal. v. Young's Mkt. Co.*, 299 U.S. 59, 62-63 (1936)); *id.* at 517 (Thomas, J., dissenting) (affirming the existence of the "widespread, unquestioned acceptance of the three-tier system of liquor regulation").

11

*See Granholm*, 544 U.S. at 489. New York requires that all liquor–whether originating in state or out of state–pass through the three-tier system. N.Y. Alco. Bev. Cont. Law §§ 102 *et seq.* Alcohol sold by in-state retailers directly to consumers in New York has already passed through the first two tiers–producer and wholesaler–and been taxed and regulated accordingly. Requiring out-of-state liquor to pass through a licensed in-state wholesaler and retailer adds no cost to delivering the liquor to the consumer not equally applied to in-state liquor. Rather, the New York regulatory scheme mandates that both in-state and out-of-state liquor pass through the same three-tier system before ultimate delivery to the consumer.

This is in stark contrast to the challenged regulations in *Granholm*. The New York and Michigan laws struck down by the Court in *Granholm* created specific exceptions to the states' three-tier systems favoring in-state producers. 544 U.S. at 474. This was exactly the type of economic protectionist policy the Commerce Clause sought to forestall, and where the *Granholm* Court drew the line. *See id.* at 489. While the Twenty-first Amendment grants the states broad powers to regulate the transportation, sale, and use of alcohol within their borders, it simply does not immunize attempts to discriminate in favor of local products and producers. *Id.*; *see also Bacchus*, 468 U.S. at 276. The challenged regulations here are evenhanded and permissibly aimed at "combat[ing] the perceived evils of an unrestricted traffic in liquor," rather than accomplishing "mere economic protectionism." *Bacchus*, 468 U.S. at 276. Thus, New York's alcohol regulatory scheme properly falls within the state's powers granted by section 2 of the Twenty-first Amendment.

Because New York's three-tier system treats in-state and out-of-state liquor the same, and

does not discriminate against out-of-state products or producers, we need not analyze the regulation further under Commerce Clause principles. Sections 100(1), 102(1)(a), and 102(1)(b) of New York's ABC Law are an integral part of New York's three-tier system.[3] Because New York's laws evenhandedly regulate the importation and distribution of liquor within the state, we hold that they do not run afoul of the Commerce Clause.

**CONCLUSION**

Sections 100(1), 102(1)(a), and 102(1)(b) of New York's Alcoholic Beverage Control Law, instituting a three-tier system for the regulation of alcoholic beverages, do not discriminate against out-of-state producers in violation of the Commerce Clause of the United States Constitution, Article I, Section 8, Clause 3, and are thus a valid exercise of the state's rights under the Twenty-first Amendment. For the foregoing reasons, the district court's order of

---

[3] Appellants' complaints of discrimination have somewhat of a hollow ring. Although they assert a willingness to comply with New York's regulatory scheme if allowed to deliver liquor directly to New York consumers, this would be virtually impossible without either an absurd operational result, or a dismantling of New York's entire three-tier scheme. For example, were they to comply with the existing system, Indiana-based Arnold Wines would be required to purchase its liquor inventory from New York wholesalers, only to ship the wine back across the country to New York consumers. *See* N.Y. Alco. Bev. Cont. L. § 102(3-b). Even if Appellants were willing to live with this rather absurd arrangement, it would violate Indiana laws requiring licensed liquor retailers to purchase inventory from licensed Indiana wholesalers. *See* Ind. Code §§ 7.1-3-14-4, 7.1-3-15-3(a). But even if Appellants succeed in their challenge to the in-state retailer requirements of New York, under existing New York Law, Arnold's Wines would not qualify for a retail license because multi-store operations are not eligible for retail licenses in New York. *See* N.Y. Alco. Bev. Cont. L. §§ 63(5), 79(2). Of course, the multi-store operations restriction is written in the context of in-state retailers. Ultimately, because it is demonstrably impossible for out-of-state retailers like Arnold Wines to comply with New York's existing three-tier scheme, granting them the relief they seek would require us to invalidate New York's three-tier system.

October 1, 2007 granting defendants' motions to dismiss is hereby AFFIRMED.

CALABRESI, *Circuit Judge*, concurring:

I join fully in Judge Wesley's opinion. I write separately to emphasize the unusual nature of judicial interpretation of the Twenty-First Amendment, a constitutional provision that, over seventy-five years, has been defined and redefined to accommodate changing social needs and norms. There is good evidence that when the Twenty-First Amendment was first adopted, section two of that amendment was intended to give states near-total control over alcohol regulation. That complete control was a stark exception to the otherwise limited scope of state commerce regulation. In the ensuing decades however, as attitudes toward alcohol have changed and its commerce has become more nationalized, the Supreme Court has increasingly read the Twenty-First Amendment more narrowly, and excluded from its protection any number of state regulatory schemes that, to be sure, discriminated against interstate commerce. This "updating" of the Twenty-First Amendment raises important theoretical questions about the role of courts in interpreting constitutional provisions that may well have become anachronistic. But apart from these "legal process" issues, the jurisprudence that the Supreme Court has created through this updating presents other problems. Regrettably, it often leaves lower courts at a loss in seeking to figure out what the Twenty-First Amendment means and what if any governing principles may be derived from the High Court's Twenty-First Amendment decisions.

I.

A.

"The history of state regulation of alcoholic beverages dates from long before adoption of the Eighteenth Amendment." *Craig v. Boren*, 429 U.S. 190, 205 (1976). As early as the *License*

15

*Cases*, 46 U.S. (5 How.) 504, 579 (1847), the Supreme Court "recognized a broad authority in state governments to regulate the trade of alcoholic beverages within their borders free from implied restrictions under the Commerce Clause." *Craig*, 429 U.S. at 205. Soon enough, however, the Supreme Court started to trim away at the edges of that regulatory power. Thus, by the late nineteenth century, the Supreme Court began to "undercut the theoretical underpinnings of the *License Cases*." *Id.* And, while the Supreme Court continued to permit states to ban alcohol altogether, *see Granholm v. Heald*, 544 U.S. 460, 476 (2005); *Mugler v. Kansas*, 123 U.S. 623 (1887), the Court, in a series of cases during the 1880s, struck down on dormant Commerce Clause grounds state laws banning or burdening the sale of imported liquor. *See Gramholm*, 544 U.S. at 476-77 (collecting cases); *see also, e.g.*, *Leisy v. Hardin*, 135 U.S. 100 (1890); *Bowman v. Chicago & Nw. Ry. Co.*, 125 U.S. 465 (1888).

In 1890, Congress tried to resolve the doctrinal "bind" the Court had created: states "could ban the production of domestic liquor . . . but these laws were ineffective because out-of-state liquor was immune from any state regulation as long as it remained in its original package." *Granholm*, 544 U.S. at 478. At the same time, the legislators tried to address schemes of state protectionism. They did this by passing the Wilson Act, which stated that "All . . . intoxicating liquors or liquids transported into any State or Territory . . . shall upon arrival in such State or Territory be subject to the operation and effect of the laws of such State or Territory enacted in the exercise of its police powers, to the same extent and in the same manner as though such liquids or liquors had been produced in such State or Territory . . . ." 27 U.S.C. § 121. This act—as described recently in *Granholm*—allowed states "to regulate imported liquor on the same terms as domestic liquor" but "did not allow States to discriminate against out-of-state liquor."

16

*Granholm*, 544 U.S. at 478.

The Wilson Act posed many interpretive challenges for the courts. The text of the statute—read literally—seemed to permit obvious end-runs around its anti-protectionist aims. The Supreme Court, however, readily interpreted the act in light of that purpose. Thus, in *Scott v. Donald*, 165 U.S. 58 (1897), the Court struck down, as a violation of the Wilson Act, a South Carolina liquor regulatory scheme that required all liquor sales to be channeled through a state liquor commissioner. The South Carolina Act instructed the commissioner to "purchase his supplies from the brewers and distillers in this State when their product reaches the standard required by this Act: Provided, Such supplies can be purchased as cheaply from such brewers and distillers in this State as elsewhere." 1895 S.C. Acts 732. And South Carolina law limited the State's markup on locally produced wines to a 10-percent profit but imposed no such cap in the case of imported wines. 165 U.S. at 93. The result of all this was invalid discrimination against out-of-state liquor.

The Court explained that the Wilson Act was "not intended to confer upon any State the power to discriminate injuriously against the products of other States in articles whose manufacture and use are not forbidden, and which are, therefore, the subjects of legitimate commerce." *Id.* at 100. The Court further held that the Wilson Act mandated "equality or uniformity of treatment under state laws," and did not allow South Carolina to provide "an unjust preference" to its products "as against similar products of the other States." *Id.* at 101.

In the late nineteenth century, states also attempted to regulate liquor by banning its direct shipment, for personal use, from out-of-state sources to citizens within the state. But the Supreme Court soon interpreted the Wilson Act as prohibiting such state laws. *See Vance v.*

17

*W.A. Vandercook Co.*, 170 U.S. 438 (1898); *Rhodes v. Iowa*, 170 U.S. 412 (1898). In 1913, Congress responded by passing the Webb-Kenyon Act which prohibits "[t]he shipment or transportation . . . of any . . . intoxicating liquor of any kind from one State, Territory, or District . . . into any other State, Territory, or District . . . [for the purpose of being] received, possessed, sold, or in any manner used . . . in violation of any law of such State, Territory, or District." 37 Stat. 699, 699-700 (codified at 27 U.S.C. § 122). It is not precisely clear what kind of regulation the Webb-Kenyon Act meant to allow. But, as it was interpreted—much later—in *Granholm*, the Webb-Kenyon Act "forb[ade] 'shipment or transportation' only where it runs afoul of the State's generally applicable laws governing receipt, possession, sale, or use." *Granholm*, 544 U.S. at 482 (internal quotation marks omitted). The result was that states could prohibit direct "shipments of alcohol to consumers for personal use, provided that the States treated in-state and out-of-state liquor on the same terms." *Id.* at 481.

B.

In 1919, the Eighteenth Amendment was ratified and prohibition began. In 1933, however, prohibition was repealed by the passage of the Twenty-First Amendment. While section one of the Twenty-First Amendment merely repealed prohibition, section two did more. That section stated that "[t]he transportation or importation into any State . . . for delivery or use therein of intoxicating liquors, in violation of the laws thereof, is hereby prohibited." U.S. Const. Amend. XXI § 2.

The language of section two is rather opaque. In its terms, it does not authorize any state regulation but rather just forbids people from transporting alcohol into a state in ways that violate

18

that state's laws.[1] Courts, nevertheless, have consistently (and understandably) read the section to authorize broad state regulation.

There is evidence that the intent of section two was to give complete regulatory authority to the states over alcohol.[2] During the congressional debate about section two, for example, one senator stated that the "purpose of section 2 is to restore to the States by constitutional amendment absolute control in effect over interstate commerce affecting intoxicating liquors which enter the confines of the States." 76 Cong. Rec. 4143 (1933) (statement of Senator Blaine). And Justice Black, who while a Senator participated in the passage of the Twenty-First Amendment in the Senate, clearly believed that section two was intended to return "'absolute control' of liquor traffic to the States, free of all restrictions which the Commerce Clause might before that time have imposed." *Hostetter v. Idlewild Bon Voyage Liquor Corp.*, 377 U.S. 324, 338 (1964) (Black, J., dissenting)

Not surprisingly, therefore, the Supreme Court "made clear in the early years following adoption of the Twenty-first Amendment that by virtue of its provisions a State is totally unconfined by traditional Commerce Clause limitations when it restricts the importation of

---

[1] As Larry Tribe once quipped, "there are two ways, and two ways only, in which an ordinary private citizen, acting under her own steam and under color of no law, can violate the United States Constitution. One is to enslave somebody . . . . The other is to bring a bottle of beer, wine, or bourbon into a State in violation of its beverage control laws." Lawrence H. Tribe, *How To Violate the Constitution Without Really Trying*, 12 Const. Commentary 217, 220 (1995).

[2] It is noteworthy, however, that the text of section two "closely follows the Webb-Kenyon and Wilson Acts," a similarity that the Supreme Court has, in more recent times, held "express[ed] the framers' clear intention of constitutionalizing the Commerce Clause framework established under those statutes." *Craig*, 429 U.S. at 205-06; *accord Granholm*, 544 U.S. at 485.

19

intoxicants destined for use, distribution, or consumption within its borders." *Hostetter*, 377 U.S. at 330; *accord Craig*, 429 U.S. at 206. And, in this period, the Court upheld near-total control over domestic alcohol commerce by states, even to the point of opening the door to "liquor-related political trade wars among the states." Lawrence H. Tribe, American Constitutional Law § 6-27, at 1168 (3d ed. 2000); *see, e.g.*, *Indianapolis Brewing Co. v. Liquor Control Comm'n*, 305 U.S. 391 (1939) (upholding Michigan's prohibition of in-state beer dealers selling beer made in Indiana); *Mahoney v. Joseph Triner Corp.*, 304 U.S. 401 (1938); *State Board v. Young's Market Co.*, 299 U.S. 59, 64 (1936). Justice Brandeis, for example, observed in *Young's Market* that "to construe the [Twenty-First] Amendment as saying, in effect: The State may prohibit the importation of intoxicating liquors provided it prohibits the manufacture and sale within its borders; but if it permits such manufacture and sale, it must let imported liquors compete with the domestic on equal terms . . . . would involve not a construction of the Amendment, but a rewriting of it." *Id.* at 62.

## C.

To the extent that the Supreme Court's early interpretation was correct, however, "rewriting" is exactly what happened. In 1964, in *Hostetter v. Idlewild Bon Voyage Liquor Corp.*, 377 U.S. 324 (1964), the Supreme Court held that a state cannot regulate passage of liquor through that state when the point of final delivery was a duty-free concession within the state, for example, delivery on board an airplane regulated by the customs service. The Court interpreted section two not as "repeal[ing] the Commerce Clause wherever regulation of intoxicating liquors is concerned," an interpretation that the Court called an "absurd simplification," but rather stated that each of the two provisions "must be considered in the light of the other, and in the context of

the issues and interests at stake in any concrete case." *Id.* at 331-32 (internal quotation marks omitted). Relying heavily on legislative history (and perhaps his own knowledge of what he had intended), Justice Black strongly disagreed. *See id.* at 338 (Black, J., dissenting). And, in 1976, in a case notable for its equal protection holding, the Supreme Court reaffirmed the point made in *Hostetter*. *See Craig*, 429 U.S. at 206 (reasoning that section two "created an exception to the normal operation of the Commerce Clause" but "does not pro tanto repeal the Commerce Clause").

In a series of cases in the 1980s, the Court applied this principle seemingly to narrow further the powers conferred upon states by the Twenty-First Amendment. First, in *Bacchus Imports, Ltd. v. Dias*, 468 U.S. 263 (1984), the Court struck down a Hawaii tax exemption that favored certain locally-produced alcohol and that was, by the state's own admission, intended to be protectionist. The Court reasoned that protectionism was not "the central purpose" of section two and that "[s]tate laws that constitute mere economic protectionism are . . . not entitled to the same deference as laws enacted to combat the perceived evils of an unrestricted traffic in liquor."[3] *Id.* at 276. Justice Stevens vigorously objected, and described an inquiry into the purpose of a liquor law as "a totally novel approach to the Twenty-First Amendment." *Id.* at 287 (Stevens, J. dissenting).

Next, in *Brown-Forman Distillers Corp. v. N.Y. State Liquor Auth.*, 476 U.S. 573 (1986), and *Healy v. Beer Inst.*, 491 U.S. 324 (1989), the Court struck down on dormant commerce grounds two state laws that required liquor producers to affirm that they were not charging any

---

[3] The Court described the "obscurity of the legislative history of section two," and dismissed Justice Brandeis's opinion in *Young's Market* as "broad language." *Id.* at 274.

higher prices in those states than in other states. The Court reasoned that the Twenty-First Amendment does not permit states to regulate sales in other states. 476 U.S. at 585.

D.

The Supreme Court's most recent foray into the question of the applicability of the Twenty-First Amendment to the dormant Commerce Clause came in *Granholm v. Heald,* 544 U.S. 460 (2005). In light of the rather extensive deference to state regulation of alcohol, there developed, even in recent times, complex state statutes that made it difficult to purchase alcohol from out of state. These statutes gave rise to the constitutional question of whether states could set up regulatory regimes where the "object and effect" was "to allow in-state wineries to sell wine directly to consumers in that State but to prohibit out-of-state wineries from doing so, or, at the least, to make direct sales impractical from an economic standpoint." *Granholm*, 544 U.S. at 466.

At issue in *Granholm* were portions of New York's and Michigan's alcoholic regulatory laws. The Court described these regimes as creating a three-tier system that "is, in broad terms and with refinements to be discussed, mandated . . . only for sales from out-of-state wineries." 544 U.S. at 467. Under Michigan's then-existing regime, out-of-state wine producers were required to "distribute their wine through wholesalers" whereas in-state producers could obtain a license to sell directly to consumers. *Id.* at 468-69. Under New York's regime at the time, wineries could ship to consumers in New York only if they could establish a physical presence in New York and/or primarily used grapes grown in New York. *Id.* at 470.

After observing (without explaining the significance of the fact) that states had formed

22

reciprocal trade agreements for direct shipping, as part of "an ongoing, low-level trade war," *id.* at 473, the Court found that Michigan's regime expressly prevented direct sales from out-of-state wineries to consumers and that New York's regime created a sometimes prohibitive burden on out-of-state wineries that wished to sell directly to consumers. (This burden included a physical presence requirement, something about which dormant Commerce Clause cases had long expressed suspicion, *id.* at 473-76).

In determining whether the Twenty-First Amendment protected the Michigan and New York regulatory schemes, the Court analyzed the Wilson and Webb-Kenyon Acts, which it asserted the Twenty-First Amendment had "constitutionaliz[ed]." *Id.* at 484 (quoting *Craig*, 429 U.S. at 205-06). The Court concluded that "[t]he aim of the Twenty-first Amendment was to allow States to maintain an effective and uniform system for controlling liquor by regulating its transportation, importation, and use," but that "[t]he Amendment did not give States the authority to pass nonuniform laws in order to discriminate against out-of-state goods, a privilege they had not enjoyed at any earlier time." *Id.* at 484-85. The Court cited several relatively recent cases, including *Healy*, *Brown-Forman*, and *Bacchus Imports*, as standing for the proposition that "state regulation of alcohol is limited by the nondiscrimination principle of the Commerce Clause," 544 U.S. at 487.

Interestingly, however, the Court also wrote that its holding would not "call into question the constitutionality of the three-tier system" insofar as "'[t]he Twenty-first Amendment grants the States virtually complete control over whether to permit importation or sale of liquor and how to structure the liquor distribution system.'" *Id.* at 488 (quoting *California Retail Liquor Dealers Ass'n v. Midcal Aluminum, Inc.*, 445 U.S. 97, 110 (1980)). And the Court stated, clear

as day, that "the three-tier system itself is 'unquestionably legitimate.'" *Id.* (quoting *North Dakota v. United States*, 495 U.S. 423, 432 (1990)). Indeed, the Court cited Justice Scalia's concurrence in the judgment in *North Dakota* and, in an explanatory parenthetical, quoted Justice Scalia's statement that "'The Twenty-first Amendment . . . empowers North Dakota to require that all liquor sold for use in the State be purchased from a licensed in-state wholesaler.'" *Granholm*, 544 U.S at 489 (quoting *North Dakota*, 497 U.S. at 447 (Scalia, J., concurring in judgment)). The Court, however, concluded this affirmation of the three-tier system by stating that "[s]tate policies are protected under the Twenty-first Amendment when they treat liquor produced out of state the same as its domestic equivalent" but that "[t]he instant cases, in contrast, involve straightforward attempts to discriminate in favor of local producers." *Id.*

## II.

The evolving interpretation of the Twenty-First Amendment raises important questions about the role of courts. It is possible that the Twenty-First Amendment was originally intended and understood to have the complex shape that it has assumed in the past few decades. But, as many distinguished justices have contended—initially in opinions for the Court and more recently in dissent—it seems more likely that the Twenty-First Amendment, when enacted, meant to carve out from dormant Commerce Clause scrutiny the area of alcohol regulation. Nevertheless, it appears that the Supreme Court has increasingly "updated" the Twenty-First Amendment, and it is this judicial process that I wish, briefly, to address.

### A.

When the Twenty-First Amendment was first adopted and courts interpreted section two to authorize virtually limitless state regulation, the United States was a different place than it is today. Laws frequently regulated "morals," and alcohol was often viewed as immoral. And even setting "morals" aside, the prevailing view of alcohol was that it was a unique product that posed unusual dangers, both directly as an intoxicant, and indirectly, as a stream of commerce that generated corruption and crime.[4] It was therefore left to individual states to decide, in light of their own local values, needs, and experiences, how to contend with that product.

Justice Jackson described this understanding when he wrote in 1941 that "[t]he people of the United States knew that liquor is a lawlessness unto itself." *Duckworth v. Arkansas*, 314 U.S. 390, 398 (1941) (Jackson, J., concurring in result). Jackson reasoned that those who created the Twenty-First Amendment

> determined that [alcohol] should be governed by a specific and particular constitutional provision. They did not leave it to the courts to devise special distortions of the general rules as to interstate commerce to curb liquor's 'tendency to get out of legal bounds.' It was their unsatisfactory experience with that method that resulted in giving liquor an exclusive place in constitutional law as a commodity whose transportation is governed by a special constitutional provision.

*Id.* at 398-99. Put differently, even those who might think that certain kinds of liquor regulation pose no benefit to temperance or public safety still wanted a broad, overinclusive authorization for state regulation, so as to prevent courts or Congress from chipping away at the states' power to regulate.

In the ensuing decades however, attitudes towards alcohol have changed, and its

---

[4] For especially interesting discussions of criminalization of vice, see William J. Stuntz, *The Pathological Politics of Criminal Law*, 100 Mich. L. Rev. 505, 572-76 (2001); and William J. Stuntz, *Race, Class, and Drugs*, 98 Colum. L. Rev. 1795 (1998).

commerce has become more nationalized. As Justice Stevens observed in his *Granholm* dissent, "[t]oday many Americans, particularly those members of the younger generations who make policy decisions, regard alcohol as an ordinary article of commerce, subject to substantially the same market and legal controls as other consumer products." *Granholm*, 544 U.S. at 494 (Stevens, J. dissenting). But, "[t]hat was definitely not the view of the generations that made policy in 1919 when the Eighteenth Amendment was ratified or in 1933 when it was repealed by the Twenty-first Amendment." *Id.*

Nowadays, alcohol is not prohibited by any state,[5] and the beer industry is one that runs theme parks rather than organized crime dens. It is not surprising, therefore, that when courts in the '60s, '70s, '80s, and today consider the notion of a Twenty-First Amendment that authorizes any state regulation, even regulation that would otherwise clearly violate the dormant Commerce Clause, they find it hard to fathom such a constitutional rule. But, as Justice Stevens said, quoting Justice Marshall, "[t]he Constitution does not prohibit legislatures from enacting stupid laws." *N.Y. State Bd. of Elec. v. Lopez-Torres*, 128 S. Ct. 791, 801 (2008) (Stevens, J. concurring).

B.

This problem of how courts should deal with seemingly anachronistic legal provisions is one with which judges and scholars have long struggled. It may appear to a judge that a legal provision is "born in another age," *Quill v. Vacco*, 80 F.3d 716, 732 (2d Cir. 1996) (Calabresi, J., concurring in the result), but what is he or she to do?

---

[5] There are still some local governments that do ban alcohol entirely.

In the context of anachronistic *statutes*, scholars and judges have made varied suggestions about what to do. They have considered any number of approaches including draconian adherence—perhaps even over-adherence—to a statute's original meaning; bold rewriting and updating; common-law evolution; use of interpretive tools that reflect current political preferences; and sending particularly dubious statutes back to legislatures for a "second look." *See, e.g.*, Guido Calabresi, A Common Law for the Age of Statutes 16-26, 31-43, 163-66 (1982).

Interpreting the *Constitution*, with respect to out-of-date constitutional provisions, presents a more complex set of challenges. Because the U.S. Constitution is so difficult to amend, a provision that has become anachronistic is even less likely to be repaired by the political branches than is an out-of-date statute. But while courts may, perhaps, be viewed as engaging in a dialogue with the political branches when "updating" anachronistic statutes through "interpretation," such a dialogue is far more difficult and dangerous in the context of constitutional law. For a court cannot easily assume that the political branches will be able correct even egregious constitutional interpretative errors.

Some constitutional provisions were written to evolve over time. The Eighth Amendment's prohibition on cruel and unusual punishment would mean little if courts were expected simply to comb through history books and determine what, in the late eighteenth century, the framers thought was "cruel." The Fourth Amendment's prohibition on "unreasonable" searches similarly permits evolution and prevents that constitutional provision from becoming tethered to another time.[6] Conversely, some provisions were not written to be

---

[6] Whether, when, and as to what provisions such updating should be carried out by courts as against legislatures is, of course, another question.

27

updated. The President of the United States must be at least 35 years old. That number is not to be "inflation adjusted." *See* Steven G. Calabresi, *Too Young for the No. 1 Job?*, Chi. Trib., July 22, 2008, at C13.

But what are courts to do when a constitutional provision neither clearly invites nor clearly prohibits updating? Some have argued that courts should interpret them in a common law fashion. *See, e.g.*, David A. Strauss, *Common Law Constitutional Interpretation*, 63 U. Chi. L. Rev. 877, 893 (1996). Others have asserted that courts should respond, in some sense, to the popular will. *See, e.g.,* Larry D. Kramer, *The Supreme Court, 2000 Term—Foreword: We the Court*, 115 Harv. L. Rev. 4 (2001); Robert Post & Reva Siegel, *Popular Constitutionalism, Departmentalism, and Judicial Supremacy*, 92 Cal. L. Rev. 1027 (2004). And some contend that courts should adhere, as best they can, to an original understanding (whatever that may be) of the provision in question. *See, e.g.*, Antonin Scalia, *Originalism: The Lesser Evil*, 57 U. Cin. L. Rev. 849 (1989).

To be sure, the Constitution as a whole does and must evolve. Moreover, as the Court may have done in its recent readings of the Twenty-First Amendment, history can be made into a tool for bringing the Charter into line with current needs. But judges are not historians with fancy robes and life tenure. And historical reinterpretation always poses the risk that courts will too readily "imagine the past [to] remember the future."[7]

---

[7] *See* Lewis B. Namier, Conflicts: Studies in Contemporary History 69-70 (1942)("When discoursing or writing about history, [people] imagine it in terms of their own experience, and when trying to gauge the future they cite supposed analogies from the past: till, by double process of repetition, they imagine the past and remember the future."). Alexander Bickel has quoted Namier's discussion of history with approval in an analysis of judicial lawmaking. *See* Alexander M. Bickel, The Supreme Court and the Idea of Progress 13 (1970); *see also* Brett G. Scharffs, *Law as Craft*, 54 Vand. L. Rev. 2245, 2314-15 (2001) (asserting that I have taken a

More fundamentally, and regardless of whether history is the chosen tool,[8] any sort of updating can be dangerous. It may permit courts, especially well-meaning ones, to substitute their own notions of modern needs for those of the majority. Moreover, when a rereading results in the erection of a constitutional barrier, it may remove serious issues from the democratic process and from legislative deliberation. *Cf.* J. Harvie Wilkinson III, *Of Guns, Abortions, and the Unraveling Rule of Law*, 95 Va. L. Rev. 253 (2009); Richard A. Posner, *In Defense of Looseness: The Supreme Court and Gun Control*, New Republic, Aug. 27, 2008, at 32.

Additionally, this sort of updating presents another problem, and one that is especially apparent in the context of the Twenty-First Amendment: It can leave state legislatures and lower federal courts with no firm understanding of what the law actually is. When one clear rule simply replaces a previous rule, the law is easy enough to understand. But when the High Court carves out one exception after another, it becomes difficult to know how any individual case should come out. From the vantage point of a court of appeals, the law frequently is fixed; and then we readily follow the Supreme Court. But in this area, absent a perfectly analogous case, we are all too frequently left to try to guess at the currently applicable rule from the Court's

similar position when teaching a common-law course).

[8] Distinguished jurists have, on occasion, been even more skeptical of court uses of history. I once suggested to Justice Felix Frankfurter that the clause in the Constitution requiring that the President be "a natural born Citizen . . . of the United States" meant only that if a person was born out of wedlock (i.e. "naturally born") that person had to be a Citizen at birth to be eligible to be President. I did this jokingly, knowing that Frankfurter, like me, had been born abroad. I added, even more fancifully, that the clause was likely there to exclude from the Presidency the much admired, but also feared, Alexander Hamilton, who was said to be of "illegitimate" birth. The scholar-justice immediately answered, "*I'll* buy that," and then added—not in jest, I believe—"and anyway it's as good as most of what goes for history on this Court!"

evolving jurisprudence, a jurisprudence that seems more focused on updating constitutional meaning than with principled judgments. To the student and teacher of the law, it appears clear that the meaning of the Twenty-First Amendment is changing. But it is difficult to know just how much the Supreme Court wants that amendment to evolve.

This leaves lower courts in a difficult situation; we strive to interpret what the law "is" while knowing well that there is no "is" but only a direction. In such circumstances, the best that we can do is to look to the bulk of cases decided by the Supreme Court and read with special care its latest decision—at the moment, *Granholm*. For, while the general direction of Supreme Court jurisprudence has been toward prohibiting any discriminatory state regulation, it is not for our court to say how far or how fast we should move along that vector. As a result, we must look to the run of Supreme Court cases that have permitted broad state regulation, and then consider the existing exceptions, particularly those both described and limited in the recent controlling *Granholm* case, and, on that basis, decide.

When we do that, we can only come out one way. To be sure, the case before us could be viewed as merely a small step beyond *Granholm*. But, in fact, for the reasons ably given in Judge Wesley's opinion, to strike down the state law under review would, at the same time, require us to ignore too much of the background jurisprudence and to extend the trend well beyond *Granholm* while ignoring some of its most specific language.

An extension of this sort is not for us to make. Although one might well argue that some of the deeper updating notions underlying *Granholm* suggest that the Supreme Court will ultimately go further than it there did, we cannot decide the case before us on the basis of such prognostications. If the Supreme Court wishes further to meld the Twenty-First Amendment into

the broad constitutional landscape, so be it.  But unless and until it does, Judge Wesley's analysis seems to me to be exactly right, and I gladly join his opinion.