**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| REED DAY; ALBERT JACOBS, | No. 23-16148 |
| *Plaintiffs - Appellants*, | D.C. No. 2:21-cv-01332-GMS |
| v. | |
| BEN HENRY, in his official capacity as Director of the Arizona Department of Liquor Licenses and Control; TROY CAMPBELL, Chair, Arizona State Liquor Board, in their official capacities; KRIS MAYES, in her official capacity as Arizona Attorney General, | ORDER AND AMENDED OPINION |
| *Defendants - Appellees*, | |
| and | |
| WINE AND SPIRITS WHOLESALERS ASSOCIATION OF ARIZONA, | |
| *Intervenor - Defendant - Appellee*. | |

Appeal from the United States District Court
for the District of Arizona
G. Murray Snow, District Judge, Presiding

Argued and Submitted October 22, 2024
Phoenix, Arizona

Filed March 4, 2025
Amended September 5, 2025

Before:  MILAN D. SMITH, JR., BRIDGET S. BADE, and
DANIELLE J. FORREST, Circuit Judges.

Order;
Amended Opinion by Judge Milan D. Smith, Jr.;
Partial Concurrence and Partial Dissent by Judge Danielle
J. Forrest

---

## SUMMARY[*]

### Commerce Clause

The panel (1) withdrew its opinion filed March 4, 2025;
and (2) replaced the opinion with an amended opinion
affirming the district court's summary judgment for state
officials and an intervenor-defendant in a 42 U.S.C. § 1983
action brought by Arizona residents alleging that the State's
statutory scheme preventing retailers without in-state

---

[*] This summary constitutes no part of the opinion of the court.  It has
been prepared by court staff for the convenience of the reader.

premises from shipping wine directly to Arizona consumers violates the Commerce Clause.

Arizona utilizes a "three-tier" system to regulate the sale and distribution of alcohol. This system allocates the sale and distribution of alcohol among producers, wholesalers, and retailers. Licensed wholesalers must buy from producers (sometimes called suppliers) and then sell to licensed retailers, who then sell to consumers. Retailers must hold their license through an Arizona resident (or qualifying corporation) and must have a physical premise managed by an Arizona resident.

The panel first held that plaintiffs met the requirements for Article III standing. The redressability requirement of standing had been met because the district court was capable of granting at least some relief, regardless of whether that relief—or any other possible relief—might ultimately prove appropriate on the merits.

The panel explained that plaintiffs' suit focused on the tension between the Commerce Clause and section 2 of the Twenty-first Amendment, which allows states to determine for themselves how best to regulate alcohol within their borders. Applying the two-part test outlined in *Tenn. Wine & Spirits Retailers Ass'n v. Thomas*, 588 U.S. 504 (2019), for assessing the constitutionality of Arizona's alcohol regulations the panel concluded that it need not decide whether Arizona's scheme is discriminatory at step one because even if Arizona's physical presence requirement is discriminatory, the requirement is an "essential feature" of Arizona's three-tier system and is supported by legitimate, nonprotectionist state interests that the Twenty-first Amendment was intended to promote.

Concurring in part and dissenting in part, Judge Forrest agreed that plaintiffs have standing to challenge Arizona's restrictions that allow only in-state retailers to ship wine to Arizona consumers, and therefore she joined Section I of the majority's analysis. But because Arizona's law is discriminatory and because the district court failed to properly analyze whether Arizona has a legitimate non-protectionist basis for its residency-based shipping restrictions, she respectfully dissented from the majority's merits analysis under *Tennessee Wine* in Section II. She would remand for the district court to conduct the required evidentiary inquiry into whether Arizona's discriminatory regulations may be justified on legitimate public health or safety grounds.

## COUNSEL

James A. Tanford (argued), Robert D. Epstein, and James E. Porter II, Epstein Seif Porter & Beutel LLP, Indianapolis, Indiana; Christopher J. Zachar, Zachar Law Firm PC, Phoenix, Arizona; for Plaintiffs-Appellants.

Luci D. Davis (argued) and Nathan T. Arrowsmith, Attorneys; Dena R. Benjamin and Linda Bergevin, Assistant Attorneys General; Kristen K. Mayes, Arizona Attorney General; Arizona Attorney General's Office, Phoenix, Arizona; for Defendants-Appellees.

Hannah H. Porter (argued) and Kevin E. O'Malley, Gallagher & Kennedy PA, Phoenix, Arizona, for Intervenor-Defendant-Appellee.

Frederick R. Yarger and William Sowers Jr., Wheeler Trigg O'Donnell LLP, Denver, Colorado; Jacob Hegeman, Wine & Spirits Wholesalers of America Inc., Washington, D.C.; for Amici Curiae Wine & Spirits Wholesalers of America Inc. and American Beverage Licensees.

John C. Neiman Jr. and Mollie G. Hughes, Maynard Nexsen PC, Birmingham, Alabama, for Amicus Curiae National Beer Wholesalers Association.

---

**ORDER**

The Opinion filed March 4, 2025 and appearing at 129 F.4th 1197 (9th Cir. 2025), is withdrawn. It may not be cited as precedent by or to this court or any district court of the Ninth Circuit. The withdrawal of the Opinion moots the pending petition for panel rehearing and rehearing en banc.

That Opinion is replaced by the amended Opinion filed simultaneously with this Order. The parties may file new petitions for panel rehearing or rehearing en banc regarding the amended Opinion.

# OPINION

M. SMITH, Circuit Judge:

Plaintiff-Appellants Reed Day and Albert Jacobs are Arizona residents who desire to ship wine directly to themselves from retailers who do not maintain in-state premises in Arizona. Arizona's statutory scheme, however, prevents such shipments. As a result, Plaintiffs brought a civil rights action against various Arizona state officials pursuant to 42 U.S.C. § 1983, challenging this statutory scheme, which they claim violates the Commerce Clause. Plaintiffs now appeal the district court's order granting summary judgment to the state officials and an intervenor-defendant. For the reasons explained below, we affirm.

## BACKGROUND

Like many states, Arizona utilizes a "three-tier" system to regulate the sale and distribution of alcohol. This system allocates the sale and distribution of alcohol among producers, wholesalers, and retailers. Licensed wholesalers must buy from producers (sometimes called suppliers) and then sell to licensed retailers, who then sell to consumers. The three-tier framework arose because of "tied-house" saloons in the pre-Prohibition era, in which alcohol producers set up saloonkeepers who promised to sell only their products and to meet minimum sales goals. *Lebamoff Enters. Inc. v. Whitmer*, 956 F.3d 863, 867 (6th Cir. 2020). The tied-house system led to excessive alcohol consumption, and after the Eighteenth Amendment was repealed, states used the significant authority given to them by § 2 of the Twenty-first Amendment to create strict boundaries between producers and consumers of alcohol. *Id.* at 867–68.

Arizona's current statutory scheme subjects all three tiers of alcohol sales and distribution to a series of complex—and overlapping—statutes and regulations. For example, all liquor shipped into Arizona must be invoiced to the wholesaler by the supplier and must be held by the wholesaler for at least twenty-four hours. Ariz. Rev. Stat. § 4-243.01(B). Meanwhile, retailers may only buy from wholesalers, registered retail agents, or a handful of other clearly defined sources. *Id.* § 4-243.01(A)(3). Retailers must hold their license through an Arizona resident (or qualifying corporation) and must have a physical premise managed by an Arizona resident. *Id.* § 4-202(A), (C). Only licensed retailers may take orders off-site (e.g., by phone or internet) and ship directly to consumers within the state. *Id.* § 4-203(J). Knowingly shipping wine directly to a purchaser in Arizona without the proper retail license is a class 2 misdemeanor. *Id.* § 4-203.04(H)(1).

As a result of these—and other—provisions, retailers who do not maintain premises in Arizona cannot ship directly to consumers within the state, but licensed retailers with in-state premises may do so. A limited exception exists for out-of-state wineries, which may receive a license to ship small quantities of their product directly to consumers. *Id.* § 4-203.04(F). The "physical-premise" or "presence" requirement, as this restriction is sometimes called, has been the subject of increasing litigation in recent years, with plaintiffs across a variety of states challenging similar requirements as a violation of the dormant Commerce Clause that cannot be otherwise justified by § 2 of the Twenty-first Amendment.

## PROCEDURAL BACKGROUND

Plaintiffs are Arizona residents and self-described "avid wine drinker[s]" who want to have wine shipped directly to them from retailers who do not have in-state premises. Following in the footsteps of litigants in other states, Plaintiffs sued Defendants—the Director of the Arizona Department of Liquor Licenses and Control, the Chair of the Arizona State Liquor Board, and the Attorney General of Arizona—in their official capacities pursuant to 42 U.S.C. § 1983. Plaintiffs sought a declaratory judgment that the ban on direct shipping from retailers without in-state premises is unconstitutional and an injunction barring Defendants from enforcing the laws that prohibit retailers without in-state premises from shipping wine to Arizona consumers. The Wine and Spirits Wholesalers Association of Arizona later joined as Intervenor-Defendant.

On August 12, 2022, Plaintiffs and Defendants filed cross-motions for summary judgment. Plaintiffs argued that because no license exists that would give a retailer without in-state premises shipping privileges, Arizona's laws discriminate against out-of-state interests in violation of the Commerce Clause. Plaintiffs then argued that these discriminatory laws could not be otherwise upheld as serving the state's legitimate interests in public health and safety because Arizona did not prove that it could not serve those interests through nondiscriminatory alternatives. In contrast, Defendants argued that the relevant laws are not discriminatory because they treat in-state and out-of-state prospective licensees the same and that, regardless, the interests served by the regulatory scheme are "more than sufficient" to sustain the laws. Intervenor-Defendant filed its own motion for summary judgment on September 9, 2022, echoing Defendants' arguments and explaining the

importance of Arizona's presence requirement to the functioning of the state's three-tier scheme.

On August 9, 2023, the district court granted Defendants' and Intervenor-Defendant's motions for summary judgment and denied Plaintiffs' motion. *Day v. Henry*, 686 F. Supp. 3d 887, 890 (D. Ariz. 2023). The district court reasoned that it was unlikely that Plaintiffs had standing and that, even if they did, their claims still failed on the merits. *Id.* at 892, 894. The district court agreed with Defendants and Intervenor-Defendant that the physical-premise requirement is not discriminatory and that, regardless, this requirement is essential to Arizona's three-tier system and is supported by legitimate nonprotectionist state interests. *Id.* at 895–99. On August 28, 2023, Plaintiffs timely appealed.

## JURISDICTION AND STANDARD OF REVIEW

We have jurisdiction pursuant to 28 U.S.C. § 1291. We review the standing issue de novo. *Hall v. Norton*, 266 F.3d 969, 975 (9th Cir. 2001). We also review de novo the district court's summary judgment order. *2-Bar Ranch Ltd. P'ship v. U.S. Forest Serv.*, 996 F.3d 984, 990 (9th Cir. 2021).

## ANALYSIS

### I. Plaintiffs have met the requirements for Article III standing

As a threshold matter, Plaintiffs have met the requirements for Article III standing. These requirements are threefold: a plaintiff must have (1) suffered an injury-in-fact that is (2) traceable to the defendant's challenged conduct, and (3) it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–

61 (1992). If "a favorable judicial decision would not require the defendant to redress the plaintiff's claimed injury, the plaintiff cannot demonstrate redressability unless she adduces facts to show that the defendant or a third party are nonetheless likely to provide redress as a result of the decision." *M.S. v. Brown*, 902 F.3d 1076, 1083 (9th Cir. 2018) (citations omitted). Plaintiffs must also show that the relief they seek is "within the district court's power to award." *Juliana v. United States*, 947 F.3d 1159, 1170 (9th Cir. 2020).

The district court found that it was "doubtful" that Plaintiffs could show standing because of two distinct problems with the element of redressability. *Day*, 686 F. Supp. 3d at 892. First, because it was "unclear which provisions Plaintiffs actually challenge," it was likely that unchallenged provisions would still block their desired relief. *Id.* A plaintiff cannot meet redressability if he or she challenges only part of a regulatory scheme and other uncontested laws would still prevent relief. *See Nuclear Info. & Res. Serv. v. Nuclear Regul. Comm'n*, 457 F.3d 941, 955 (9th Cir. 2006). Second, the district court found that it was not clear "that the [c]ourt could, or in any event, would grant the relief that Plaintiffs request," which included enjoining unidentified statutes, rewriting the regulations, or commanding the legislature to redo the licensing scheme. *Day*, 686 F. Supp. 3d at 892, 894. The district court rejected the idea of "leveling down," in which it could cure the constitutional issue by enjoining retailers with in-state premises from shipping to Arizona consumers (as opposed to "leveling up" by extending shipping rights to all retailers), because doing so would "not . . . provide these Plaintiffs with the relief that they request." *Id.* at 893.

We disagree with the district court and find that Plaintiffs have met the requirements for standing. Standing is a threshold consideration that must be determined before considering the merits. *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94–95 (1998). Notably, a plaintiff satisfies redressability "when he shows that a favorable decision will relieve a discrete injury to himself," not that "a favorable decision will relieve his *every* injury." *Larson v. Valente*, 456 U.S. 228, 243 n.15 (1982) (emphasis in original). Moreover, a district court is not limited to a plaintiff's proposal and instead "may enter any injunction it deems appropriate, so long as the injunction is no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Kirola v. City & Cnty. of San Francisco*, 860 F.3d 1164, 1176 (9th Cir. 2017) (internal quotation marks omitted).

As a preliminary matter, Plaintiffs did challenge the relevant laws, routinely listing in their complaint and briefing the specific statutes they were challenging. Therefore, Plaintiffs' claims do not possess the fatal flaw of failing to identify independent provisions that would still block relief should the court enjoin only the challenged statutes. *See Nuclear Info. & Res. Serv.*, 457 F.3d at 955. Instead, what Plaintiffs inconsistently identified was their requested *relief*: They routinely changed which particular statutes they wanted enjoined and later agreed with the district court that they wanted the court to direct the legislature to "fix" the unconstitutional laws generally. But, as noted above, the district court was not limited to Plaintiffs' suggestions and had the authority to create its own remedy. *See Sharp v. Weston*, 233 F.3d 1166, 1173 (9th Cir. 2000) ("Once a constitutional violation has been found, a district court has broad powers to fashion a remedy.").

Redressability is meant only to be "a constitutional minimum, depending on the relief that federal courts are *capable* of granting." *Kirola*, 860 F.3d at 1176 (emphasis in original).

Here, the district court was capable of granting at least some relief. For example, the district court could have enjoined the enforcement of the statutory scheme as applied to all liquor retailers and wholesalers inside *and* outside of Arizona. This solution would negate the Commerce Clause issue by eliminating enforcement of the allegedly discriminatory laws altogether.[1] Although such an injunction might be broad, it is not the kind of relief that is outside the power of Article III courts under *Juliana*. *See Johnson v. City of Grants Pass*, 72 F.4th 868, 882 (9th Cir. 2023) (explaining that enjoining the enforcement of a few municipal ordinances "cannot credibly be compared to an injunction seeking to require the federal government to 'phase out fossil fuel emissions and draw down excess atmospheric CO2'" (quoting *Juliana*, 947 F.3d at 1164–65)), *rev'd on other grounds*, *City of Grants Pass v. Johnson*, 603 U.S. 520 (2024). Therefore, because the district court was capable of granting at least some relief, and regardless of whether that relief—or any other possible relief—might ultimately prove appropriate on the merits, the redressability requirement of standing has been met. *See Seattle Pac.*

---

[1] Intervenor-Defendant protests that such a "leveling up" would contravene the Arizona Legislature's intent to "retain the current three-tier" system. 2006 Ariz. Sess. Laws 1098. Any such restraint would be a merits determination about the appropriate remedy, not an Article III constraint on the district court's power. To hold otherwise would allow states to litigation-proof any regulatory scheme by including "level-down" provisions to defeat standing.

*Univ. v. Ferguson*, 104 F.4th 50, 63 (9th Cir. 2024) (stating that "redressability should not be conflated with the merits").

## II. Legal Background on the Twenty-first Amendment

Plaintiffs' suit focuses on the tension between two constitutional provisions: § 2 of the Twenty-first Amendment and the Commerce Clause. In 1920, the Eighteenth Amendment became effective, ushering in Prohibition by banning the manufacture, sale, or transportation of liquor. U.S. Const. amend. XVIII § 1. Thirteen years later, the country changed course and ratified the Twenty-first Amendment, repealing the Eighteenth Amendment. U.S. Const. amend. XXI § 1. But the Twenty-first Amendment "did not return the Constitution to its pre-1919 form." *Bridenbaugh v. Freeman-Wilson*, 227 F.3d 848, 853 (7th Cir. 2000). Rather, while § 1 repealed the Eighteenth Amendment, § 2 added new language clarifying that "[t]he transportation or importation into any State, Territory, or possession of the United States for delivery or use therein of intoxicating liquors, in violation of the laws thereof, is hereby prohibited." U.S. Const. amend. XXI § 2. This addition was modeled on pre-Prohibition legislation that was intended to "give each State a measure of regulatory authority over the importation of alcohol." *Tenn. Wine & Spirits Retailers Ass'n v. Thomas*, 588 U.S. 504, 525, 528 (2019). The wording used in this pre-Prohibition legislation—and later in § 2—was framed "not as a measure conferring power on the States but as one prohibiting conduct that violated state law." *Id.* at 526.

Over time, the broad language of § 2 has come into conflict with other parts of the Constitution, most notably the Commerce Clause, which reserves for Congress the power

"[t]o regulate Commerce . . . among the several States."
U.S. Const. art. 1, § 8, cl. 3.  The "negative" reading of this
clause—known as the "dormant Commerce Clause"—
prevents states from adopting protectionist measures that
unduly restrict interstate commerce.  *See Nat'l Pork
Producers Council v. Ross*, 598 U.S. 356, 368–69 (2023).
Although the Supreme Court initially treated § 2 as
functionally overriding other constitutional provisions,
including the Commerce Clause, it eventually walked back
that interpretation, and the Court now considers the Dormant
Commerce Clause to limit a state's ability to discriminate
against interstate commerce under the Twenty-first
Amendment.  *See Tenn. Wine*, 588 U.S. at 529–31
(discussing the evolution of the Supreme Court's
understanding of § 2).

Two recent cases, *Granholm* and *Tennessee Wine*,
navigate this tension between the Dormant Commerce
Clause and the Twenty-first Amendment and form the
foundation of the dispute between the parties in this case.
First, in *Granholm*, the Court considered whether Michigan
and New York laws that allowed in-state, but not out-of-
state, wineries to sell directly to consumers violated the
Dormant Commerce Clause, and if so, whether that
discrimination was authorized by the Twenty-first
Amendment.  *Granholm v. Heald*, 544 U.S. 460, 465–66
(2005).  The Court held that the answer to the first question
was yes, because the underlying cases "involve[d]
straightforward attempts to discriminate in favor of local
producers," and that the answer to the second question was
no, because the states had provided "little concrete
evidence" that could otherwise justify such discriminatory
schemes.  *Id.* at 489, 492.  The Supreme Court concluded

that "[i]f a State chooses to allow direct shipment of wine, it must do so on evenhanded terms."  *Id.* at 493.

Second, in *Tennessee Wine*, the Supreme Court expanded *Granholm*'s logic beyond the producer tier, concluding that Tennessee's "onerous" durational residency requirement for retailers—to obtain an alcohol retail license, an individual had to be a resident of the state for two years, and a corporation could not get a retail license until all of its officers, directors, and capital stock owners satisfied that same requirement—was a discriminatory scheme that violated the Dormant Commerce Clause.  588 U.S. at 511, 518.  The Court then concluded that this discriminatory scheme could not otherwise be justified as advancing the goals of the Twenty-first Amendment because the provision at issue had "at best a highly attenuated relationship to public health or safety" and because the overall nature of the scheme made it "hard to avoid the conclusion that [the laws'] purpose and effect is protectionist."  *Id.* at 539–40.  The Court therefore struck down the scheme as unconstitutional. *Id.* at 543.

In the years since, courts have implicitly and explicitly interpreted *Tennessee Wine* as creating a two-part test for assessing the constitutionality of state alcohol regulations.[2]

---

[2] Courts that have explicitly adopted a two-part test based on *Tennessee Wine* include the First, Third, and Fourth Circuits.  *See Anvar v. Dwyer*, 82 F.4th 1, 8 (1st Cir. 2023); *Jean-Paul Weg LLC v. Dir. of N.J. Div. of Alcoholic Beverage Control*, 133 F.4th 227, 234 (3d Cir. 2025); *B-21 Wines, Inc. v. Bauer*, 36 F.4th 214, 222 (4th Cir. 2022).  Meanwhile, the Sixth and Eighth Circuits have conducted somewhat similar analyses, but under less clear formulations of the *Tennessee Wine* test.  *See Lebamoff Enters. Inc. v. Whitmer*, 956 F.3d 863, 871 (6th Cir. 2020); *Block v. Canepa*, 74 F.4th 400, 412–13 (6th Cir. 2023); *Sarasota Wine Mkt., LLC v. Schmitt*, 987 F.3d 1171, 1181, 1184 (8th Cir. 2021).

At step one of the test, the court must address whether the challenged statutory scheme discriminates against nonresidents. *Id.* at 539. If not, then the scheme is constitutional, and the court need not proceed to step two. However, if the laws *are* discriminatory, the court then asks "whether the challenged requirement can be justified as a public health or safety measure or on some other legitimate nonprotectionist ground." *Id.* If so, the scheme is constitutional despite its discriminatory nature. *See id.*

Since *Tennessee Wine*, our sister circuits have split as to how to handle both parts of this test. As detailed below, we conclude that we need not decide whether Arizona's scheme is discriminatory at step one of the *Tennessee Wine* test because Arizona's physical-presence requirement may otherwise be upheld at step two as an essential feature of Arizona's three-tier system.

### III. We need not decide whether Arizona's laws are discriminatory

At step one of the *Tennessee Wine* test, we ask whether a particular liquor regulation is discriminatory. There are three ways that a statutory scheme can discriminate against out-of-state interests: facially, purposefully, or in practical effect. *See Nat'l Ass'n of Optometrists & Opticians LensCrafters, Inc. v. Brown*, 567 F.3d 521, 525 (9th Cir. 2009). The first step in analyzing any law under the dormant Commerce Clause is "to determine whether it 'regulates evenhandedly with only "incidental" effects on interstate commerce, or discriminates against interstate commerce.'" *Or. Waste Sys., Inc. v. Dep't of Env't Quality of Or.*, 511 U.S. 93, 99 (1994) (quoting *Hughes v. Oklahoma*, 441 U.S. 322, 336 (1979)). Discrimination means "differential treatment of in-state and out-of-state economic interests that

benefits the former and burdens the latter." *Id.* This differential treatment must be "as between persons or entities who are similarly situated." *See Black Star Farms LLC v. Oliver*, 600 F.3d 1225, 1230 (9th Cir. 2010). The party challenging the scheme "bears the burden of showing discrimination." *Id.*

Plaintiffs urge us to find at the first step of the *Tennessee Wine* test that Arizona's laws improperly discriminate against interstate commerce. Plaintiffs argue that *Granholm* and *Tennessee Wine*, in which the Supreme Court found various state wine laws to be discriminatory, necessarily dictate a similar outcome here; that Arizona is giving its wine retailers "exclusive access" to the e-commerce market, which is improper economic protectionism; and that because Arizona does not carry most old, foreign, and rare wines, Arizona is also depriving its citizens of the right "to have access to the markets of other States on equal terms." In response, Defendants argue that Arizona's laws are not discriminatory because retailers from any state are free to obtain licenses, and that, unlike the kind of durational residency requirement at issue in *Tennessee Wine*, a physical-premise requirement is not a "per se burden" on out-of-state companies. The district court agreed with Defendants, finding that there was no discrimination because Arizona's physical-premise requirement "applies evenhandedly to in-state and out-of-state retailers." *Day*, 686 F. Supp. 3d at 896.

Whether this kind of requirement is discriminatory has split the circuits. In the pre-*Granholm* era, the Seventh Circuit easily found that such requirements were not discriminatory, commenting that "[e]very use of § 2 could be called 'discriminatory' in the sense that plaintiffs use that term, because every statute limiting importation leaves

intrastate commerce unaffected." *Bridenbaugh*, 227 F.3d at 853 (emphasis omitted). Meanwhile, between *Granholm* and *Tennessee Wine*, the Second Circuit determined that New York's physical-premise requirement was not discriminatory because it "evenhandedly regulate[d] the importation and distribution of liquor within the state." *Arnold's Wines, Inc. v. Boyle*, 571 F.3d 185, 192 (2d Cir. 2009). The Fifth Circuit came to a similar conclusion. *See Wine Country Gift Baskets.com v. Steen*, 612 F.3d 809, 821 (5th Cir. 2010) (concluding that Texas could require its authorized retailers to sell from locations physically located in Texas).

In the immediate aftermath of *Tennessee Wine*, our sister circuits seemed reluctant to deviate from prior caselaw. In *Lebamoff Enterprises, Inc. v. Whitmer*, the first post-*Tennessee Wine* case, the Sixth Circuit expressed doubt that Michigan's physical-premise requirement was discriminatory, although it ultimately determined that it did not need to decide the case on that basis because Michigan's law could otherwise be justified at what is now known as step two of the *Tennessee Wine* test. *See* 956 F.3d at 870–71. Then, in *Sarasota Wine Market, LLC v. Schmitt*, the Eighth Circuit held that Missouri's physical-premise requirement might be "economically and socially anachronistic" but that the scheme did not discriminate against out-of-state interests because it applied the same licensing requirements to all retailers and the rules governing direct shipment applied "evenhandedly" to all those who qualified for the relevant license. 987 F.3d 1171, 1184 (8th Cir. 2021).

Following *Sarasota Wine Market*, however, circuits have uniformly found that such requirements are discriminatory, albeit on inconsistent grounds. First, in *B-*

*21 Wines, Inc. v. Bauer*, the Fourth Circuit concluded that because in-state retailers had privileges that out-of-state retailers did not, North Carolina's laws were facially discriminatory. 36 F.4th 214, 223 (4th Cir. 2022). Then, the Sixth Circuit seemed to contradict its prior tentative reasoning in *Lebamoff*, apparently assuming (without further explanation) in *Block v. Canepa* that Ohio's direct-shipment restriction was discriminatory. *See* 74 F.4th 400, 413 (6th Cir. 2023). Shortly after *Block*, the First Circuit found that Rhode Island's laws "facially discriminate[d]" against out-of-state retailers by forcing licensees to maintain a physical premise in the state, which meant that out-of-state retailers could not deliver alcohol to Rhode Island residents as in-state retailers could. *Anvar v. Dwyer*, 82 F.4th 1, 9 (1st Cir. 2023). Finally, and most recently, the Third Circuit held that such requirements were discriminatory *in effect* (rather than simply on their face) because they imposed heightened financial burdens on out-of-state retailers. *Jean-Paul Weg LLC v. Dir. of N.J. Div. of Alcoholic Beverage Control*, 133 F.4th 227, 236 (3d Cir. 2025).

Ultimately, like the Sixth Circuit in *Lebamoff*, we conclude that we need not wade into this particular part of the "quagmire" that constitutes our Dormant Commerce Clause jurisprudence. *Nw. States Portland Cement Co. v. Minnesota*, 358 U.S. 450, 458 (1959). As explained below, we hold that even if Arizona's physical-premise requirement is discriminatory, it can nonetheless be upheld at step two of the *Tennessee Wine* test. Accordingly, we assume without deciding that Arizona's laws are discriminatory and proceed to step two.

## IV.  Arizona's physical-premise requirement may be upheld as an essential part of the state's three-tier scheme

At step two of the *Tennessee Wine* test, courts ask "whether the challenged [regime] can be justified as a public health or safety measure or on some other legitimate nonprotectionist ground."  *B-21 Wines*, 36 F.4th at 222 (alteration in original) (quoting *Tenn. Wine*, 588 U.S. at 539).  If a court answers in the affirmative, the regulatory scheme is "shielded by § 2."  *See Tenn. Wine*, 588 U.S. at 539–40.

A circuit split has developed regarding step two of this test as well, although the break here is somewhat cleaner than the compound fracture that characterizes the variety of approaches to the application of step one.  Specifically, in the post-*Tennessee Wine* era, the Third, Fourth, and Eighth Circuits have held that physical-premise requirements may be upheld simply because they are an essential feature of a state's three-tier scheme.[3]  *See B-21 Wines*, 36 F.4th at 228; *Sarasota Wine Mkt.*, 987 F.3d at 1184; *Jean-Paul Weg*, 133 F.4th at 239 (alternatively holding that New Jersey's regulations were "independently justified as essential features of" a three-tier scheme).  The justification is that the three-tier scheme is inherently tied to the public health and safety measures the Twenty-first Amendment was intended to promote.  *See B-21 Wines*, 36 F.4th at 226–28.  In contrast, the First Circuit has held that "a discriminatory aspect of a state's version of the three-tier system cannot be given a judicial seal of approval premised . . . on the virtues of three-

---

[3] Before *Tennessee Wine*, several circuits came to similar conclusions. *See, e.g.*, *Arnold's Wines*, 571 F.3d at 191–92; *Wine Country*, 612 F.3d at 818–19.

tier systems generally" and that "concrete evidence" must demonstrate that the "predominant effect" of the challenged regulatory scheme is to advance goals like public health and safety. *Anvar*, 82 F.4th at 10–11 (citation omitted). The Sixth Circuit's current approach is largely similar to that of the First Circuit.[4] *See Block*, 74 F.4th at 414 (remanding to the district court to analyze competing evidence as to whether Ohio's physical-premise requirement primarily promoted public health or protectionism).

The district court adopted the current majority approach as an alternative holding. That is, the district court concluded that even *if* Arizona's laws were discriminatory, the physical-premise requirement is "such an essential feature" of Arizona's three-tier system that "it is supported by legitimate, nonprotectionist state interests." *Day*, 686 F. Supp. 3d at 897. The district court reasoned that opening the state to direct deliveries from retailers without in-state premises would "effectively eliminate the role" of Arizona's wholesalers and "create a sizable hole in the three-tier system." *Id.* at 898 (quoting *Lebamoff*, 956 F.3d at 872). The district court rejected—among other arguments— Plaintiffs' contention that the state's interests were not legitimate because other states allow out-of-state shipping,

---

[4] *Lebamoff* had held that Michigan's presence requirement could be justified in part because "there is no other way it could preserve the regulatory control provided by the three-tier system." 956 F.3d at 874. However, although *Block* purported not to overrule *Lebamoff*, its conclusion that Ohio needed to provide evidence supporting the public health benefits of its direct shipment ban is largely at odds with the broad language of the *Lebamoff* majority opinion regarding the necessity of these laws to the functioning of a three-tier scheme. *Block*, 74 F.4th at 413–14. Instead, *Block* functionally follows the *Lebamoff* concurring opinion. *See id; see also Lebamoff*, 956 F.3d at 877–79 (McKeague, J., concurring).

pointing out that the Twenty-first Amendment allows states to determine for themselves how best to regulate alcohol within their borders. *Id.* at 898–99. The district court also rejected Plaintiffs' argument that Arizona has abandoned the three-tier system for wine by allowing certain wineries to ship directly to customers, noting that "[c]reating an exception is not abandoning the entire system." *Id.* at 899.

We agree with the district court. As an initial matter, in *Granholm*, the Supreme Court reiterated that the "three-tier system itself is 'unquestionably legitimate.'" 544 U.S. at 489 (quoting *North Dakota v. United States*, 495 U.S. 423, 432 (1990)). Although Plaintiffs claim this language is merely dictum, the *Granholm* Court made this statement in the context of finding that the challenged regulations were a discriminatory *exception* to the three-tier scheme, rather than—as the defendants there argued—an integral part of it. *Id.* at 488–89. As the Second Circuit pointed out when rejecting an identical argument, "[h]ad the three-tier system itself been unsustainable under the Twenty-first Amendment, the *Granholm* Court would have had no need to distinguish it from the impermissible regulations at issue." *Arnold's Wines*, 571 F.3d at 191. Moreover, the *Tennessee Wine* Court subsequently spoke approvingly of the three-tier system, distinguishing the unnecessary durational residency requirement at issue from elements that were "essential" to the functioning of that system. *See* 588 U.S. at 535.

As several of our sister circuits have recognized since *Tennessee Wine*, the physical-premise requirement is—unlike the durational residency requirement at issue in *Tennessee Wine*—an essential piece of the "unquestionably legitimate" three-tier system. *See B-21 Wines*, 36 F.4th at 228 (holding that North Carolina's requirement was an "integral part" of the state's three-tier system because it

"directly relate[d] to North Carolina's ability to separate producers, wholesalers, and retailers"); *Jean-Paul Weg*, 133 F.4th at 239 (concluding that "permitting out-of-state retailers to sell alcohol from outside of a state's three-tier system creates a regulatory hole large enough to shake the foundations of the three-tier model"); *Sarasota Wine Mkt.*, 987 F.3d at 1183 ("Sarasota without question attacks core provisions of Missouri's three-tiered system . . . .'").

By removing the physical-premise requirement, we would effectively be hacking off two of the three legs that constitute Arizona's three-tiered system. As a practical matter, in-state retailers (i.e., licensed retailers with physical premises in Arizona) *are* the third tier of the state's three-tier system. *See Arnold's Wines*, 571 F.3d at 190 ("[B]ecause in-state retailers make up the third tier in New York's three-tier regulatory system, Appellants' challenge to the [statutory] provisions requiring all wholesalers and retailers be present in and licensed by the state is a frontal attack on the constitutionality of the three-tier system itself." (citation omitted)). As traditionally understood, the three-tier system "has an opening at the top available to all," and once the product is inside that system, it must remain within the system. *Wine County*, 612 F.3d at 815. Relatedly, because—as a legal and practical matter—out-of-state retailers could not be subject to Arizona's wholesaler requirements,[5] and because different states treat wholesalers

---

[5] As other circuits have recognized—and as Plaintiffs do not meaningfully refute—there are myriad practical and legal issues that would crop up if Arizona tried to regulate out-of-state wholesalers or if out-of-state retailers had to comply with Arizona's wholesaler purchase requirement. *See Lebamoff*, 956 F.3d at 872–73 (discussing the extraterritoriality doctrine); *Arnold's Wines*, 571 F.3d at 192 n.3 (discussing the "absurd operational result" that would occur if the

differently, allowing direct shipment from retailers without in-state premises functionally eliminates Arizona's control over the wholesaler tier. *See also Lebamoff*, 956 F.3d at 872 ("Opening up the State to direct deliveries from out-of-state retailers necessarily means opening it up to alcohol that passes through out-of-state wholesalers or for that matter no wholesaler at all.").

Simply put, allowing direct shipment of wine to Arizona consumers from out-of-state retailers would cut so many holes in the state's "unquestionably legitimate" three-tier system that the system would functionally cease to exist.[6] And because the physical-premise requirement is therefore an "essential feature" of Arizona's three-tier system, we may uphold it without further determinations as to whether its predominant effect is to support public health and safety. *See B-21 Wines*, 36 F.4th at 227 n.8. Nonetheless, we acknowledge that the physical-presence requirement does bear on a state's ability to support public health and safety. For example, Arizona conducted thousands of on-site inspections of licensees' establishments between 2016 and 2021, in addition to running covert underage buyer programs. Arizona also inspects the records of wholesalers

---

Indiana-based Arnold's Wines were required to purchase its inventory from New York wholesalers only to ship the wine back to New York consumers).

[6] Although the First Circuit concluded that "there is nothing inherent in the three-tier system—which aims at preventing vertical integration between alcohol producers, wholesalers, and retailers—that necessarily demands an in-state-presence requirement for retailers," *Anvar*, 82 F.4th at 10–11, that reasoning overlooks the basic framework of § 2. The three-tier system might be premised on separating the tiers, but the Twenty-first Amendment explicitly gave each state the power to regulate alcohol importation for itself. U.S. Const. amend. XXI § 2.

to determine whether a retailer is complying with Arizona liquor laws. Notably, the *Tennessee Wine* Court acknowledged the importance of in-state physical premises for such reasons, commenting that "on-site inspections" could serve as one way to maintain oversight over liquor stores. *Tenn. Wine*, 588 U.S. at 541; *see also Jean-Paul Weg*, 133 F.4th at 239 (concluding that "New Jersey's physical presence requirement [was] key to enforcing its [three-tier] system by keeping retailers within its investigators' jurisdiction"). Without a physical-premise requirement, the three-tier scheme falls apart, and so do some of the benefits that come with it.

Like the district court, we reject Plaintiffs' assertion that Arizona does not have a three-tier system for wine anymore because wineries can now sell directly to consumers (and so, the logic goes, Arizona cannot justify the physical-premise requirement on the grounds that it is essential to a system that no longer exists). *Day*, 686 F. Supp. at 899. A limited exception does not swallow the whole. There are only about 11,000 wineries in the United States, as opposed to approximately 400,000 wine retailers. As of June 30, 2021, Arizona had only granted 1,030 direct shipment licenses. Allowing deliveries from such a small number of wineries is a minor exception that does not negate the existence of Arizona's much larger three-tier system, and it is within Arizona's discretion to create this kind of limited exception. *See B-21 Wines*, 36 F.4th at 226 (rejecting the argument that North Carolina had "abandoned" its three-tier systems by permitting direct shipments from wineries).

We also reject the argument that Arizona must prove that nondiscriminatory alternatives would be insufficient to further the state's interest in public health and safety. As other circuits to consider this issue have noted, such a

requirement "conflates the proper Twenty-first Amendment inquiry with a traditional analysis under the dormant Commerce Clause." *Anvar*, 82 F.4th at 11; *see B-21 Wines*, 36 F.4th at 224–25 (concluding that such a requirement was not central to the *Tennessee Wine* analysis); *see also Jean-Paul Weg*, 133 F.4th at 238. In *Tennessee Wine*, the Supreme Court did discuss the existence (or lack thereof) of nondiscriminatory alternatives, but only after determining that the law at issue was a discriminatory regime that was not otherwise authorized by the Twenty-first Amendment. *See* 588 U.S. at 540–43. Here, Arizona's physical-premise requirement is authorized by the Twenty-first Amendment as an essential feature of the state's three-tier scheme, so no further consideration of nondiscriminatory alternatives was necessary. Regardless, the existence of such alternatives is merely a relevant factor that a district court may consider when assessing whether the challenged laws promote public health and safety; on its own, it "does not, for purposes of a Twenty-first Amendment inquiry, necessarily invalidate a challenged law." *Anvar*, 82 F.4th at 11.

Over the last century, the Supreme Court has slowly but steadily limited the outer reaches of the Twenty-first Amendment, rejecting the view that § 2 shields all state alcohol regulations from the Dormant Commerce Clause and instead applying an increasingly stricter framework through which we analyze the constitutionality of these laws. *See Arnold's Wines*, 571 F.3d at 192–201 (Calabresi, J., concurring) (discussing the history of Twenty-first Amendment jurisprudence). But until and unless the Supreme Court decides to withdraw its wholesale support for this long-standing model, we agree that "we should be no more invasive of the 'unquestionably legitimate' three-tiered system than the Supreme Court has mandated." *Sarasota*

*Wine Mkt.*, 987 F.3d at 1184; *see also Arnold's Wines*, 571 F.3d at 201 (Calabresi, J., concurring) ("[W]hile the general direction of Supreme Court jurisprudence has been toward prohibiting any discriminatory state regulation, it is not for our court to say how far or how fast we should move along that vector."). The Supreme Court has not yet struck such a blow to § 2, and neither do we.

## CONCLUSION

For the foregoing reasons, the judgment of the district court is **AFFIRMED**.

FORREST, Circuit Judge, concurring in part and dissenting in part.

I agree that Plaintiffs have standing to challenge Arizona's restrictions that allow only in-state retailers to ship wine to Arizona consumers, and therefore I join Section I of the majority's analysis. But because Arizona's law is discriminatory and because the district court failed to properly analyze whether Arizona has a legitimate non-protectionist basis for its residency-based shipping restrictions, I respectfully dissent from the majority's merits analysis under *Tennessee Wine & Spirits Retailers Association v. Thomas*, 588 U.S. 504 (2019), in Section II. I would remand for the district court to conduct the required evidentiary inquiry into whether Arizona's discriminatory regulations may be justified on legitimate public health or safety grounds.

### *Tennessee Wine* Analysis

As the majority explains, the Supreme Court has developed a two-step framework to reconcile the apparent

tension between § 2 of the Twenty-first Amendment and the dormant Commerce Clause. *See* Maj. Op. 13–15. We apply normal Commerce Clause principles at the first step, finding suspect any state regulation that discriminates against interstate commerce. *See Tennessee Wine*, 588 U.S. at 533, 539. A finding of discrimination is typically fatal. *Id.* at 539. But the Twenty-first Amendment gives states some leeway when regulating alcohol. *Id.* If the state provides concrete evidence that its discriminatory regime advances public health, safety, or another legitimate non-protectionist interest that could not be served by nondiscriminatory measures, it may continue to enforce its discriminatory regulations. *Id.* at 539–40.

## I.  Step One: Discrimination

The majority does not decide whether Arizona's shipping restriction discriminates against interstate commerce at *Tennessee Wine*'s first step because it concludes that, regardless, plaintiffs' claim fails at step two. I would reach this first issue and conclude that Arizona's law is discriminatory.

Arizona argues its shipping restriction is not discriminatory because it distinguishes only between licensed and unlicensed retailers, not between residents and nonresidents. There is no guarantee, the argument goes, that an in-state retailer will have a brick-and-mortar presence and an Arizona manager, and thus be eligible for a license. And out-of-state retailers can obtain the proper license. All they have to do is open a storefront in Arizona and hire an Arizonan to manage the store and hold the license. That view of interstate commercial discrimination defies both precedent and common sense.

If I said I would only hire clerks who had studied in my alma mater's law library, I could not maintain that I have no hiring preference for University of Idaho students. Sure, a Harvard student could fly to Spokane, drive to Moscow, read a few cases in the library, and then apply. Likewise, there is no guarantee that any given University of Idaho student has studied in the law library. But that is not the point. I have plainly adopted a preference for University of Idaho students and discriminated against all others.

The Supreme Court has never allowed such easy workarounds to the Commerce Clause's antidiscrimination command. Take *Dean Milk Co. v. City of Madison*, 340 U.S. 349 (1951). Madison allowed the sale of pasteurized milk only if it was bottled within five miles of city limits, and all other milk only if it was sourced from within twenty-five miles. *Id.* at 350–51. An Illinois distributor had no difficulty convincing the Court that the ordinance "plainly discriminate[d] against interstate commerce." *Id.* at 354. And that is because the state had "erect[ed] an economic barrier" foreclosing "competition from without the State." *Id.* There is no indication that the Court would have reached a different decision had it considered that the Illinois corporation could have purchased a Madison dairy and hired some industrious Madisonian milkers to gain access to that market.

More to the point, the Supreme Court has rejected precisely the argument that Arizona makes. In *Granholm v. Heald*, the Court reviewed a licensing scheme that allowed out-of-state wineries to ship wine directly to consumers only if they opened an in-state branch office and warehouse. 544 U.S. 460, 474–75 (2005). The Court concluded that the "in-state presence requirement runs contrary to our admonition that States cannot require an out-of-state firm 'to become a

resident in order to compete on equal terms.'" *Id.* at 475 (quoting *Halliburton Oil Well Cementing Co. v. Reily*, 373 U.S. 64, 72 (1963)).

It draws too fine a line to look only to a retailer's state of incorporation. *Granholm* did not define residency based on legal formalities. Rather, it concluded that New York would require an out-of-state firm to "become a resident" if the firm were forced to establish an in-state presence to obtain equal access to the New York market. *Id.* At bottom, Arizona allows only those retailers willing to set up shop in-state to ship wine to Arizonans. That type of "economic isolationism" is "facially discriminatory, in part because it tend[s] 'to discourage domestic corporations from plying their trades in interstate commerce.'" *Camps Newfound/Owatonna Inc. v. Town of Harrison*, 520 U.S. 564, 579 (1997) (quoting *Fulton Corp. v. Faulkner*, 516 U.S. 323, 333 (1996)). Defining regulations as neutral by looking only to where a retailer is headquartered or based would allow precisely the "economic Balkanization" that the dormant Commerce Clause seeks to avoid. *See Granholm*, 544 U.S. at 472 (quoting *Hughes v. Oklahoma*, 441 U.S. 322, 325 (1979)).

Arizona's attempt to distinguish *Granholm* is unavailing, at least at this stage in the analysis. It argues that *Granholm* applies only to exceptions to a state's three-tier scheme, and that Plaintiffs' challenge is to an integral part of its three-tier scheme. A law's relationship to the three-tier system, though, is at most relevant at the second step of the *Tennessee Wine* analysis. *See* 588 U.S. at 535. It has no bearing on whether a law is discriminatory. *See id.*; *Granholm*, 544 U.S. at 476; *see also B-21 Wines, Inc. v. Bauer*, 36 F.4th 214, 222–23, 227–28 (4th Cir. 2022)

(considering the law's centrality to the three-tier system at step two after finding it discriminatory at step one).

As to *Tennessee Wine*, it is true that Tennessee implemented a more egregious two-year waiting period before new state residents could obtain a retail license, 588 U.S. at 504. But nowhere did the Supreme Court purport to establish that scheme as the floor of unconstitutionality. A regulatory regime like Arizona's may be slightly less problematic but discriminatory all the same.

Ultimately, we are faced with much the same licensing scheme and arguments that the Fourth Circuit confronted in *B-21 Wines*. That court acknowledged

> that out-of-state wine retailers can obtain a permit to ship their product to North Carolina residents, provided, inter alia, that those retailers are managed or owned by a North Carolina resident, have in-state premises, and buy their product from an in-state wholesaler. But that prospect does not eliminate the statutorily mandated differential treatment.

*Id.* at 223 n. 5 (citing *Granholm*, 544 U.S. at 474–75). Whatever complexities and disagreements there may have been at step two of the *Tennessee Wine* framework, *compare id.* at 227–29, *with id.* at 232–38 (Wilkinson, J., dissenting), the Fourth Circuit had no difficulty finding North Carolina's scheme discriminatory at step one.[1] Neither should we.

---

[1] *See also Anvar v. Dwyer*, 82 F.4th 1, 9 (1st Cir. 2023); *Block v. Canepa*, 74 F.4th 400, 413–14 (6th Cir. 2023); *Jean-Paul Weg v. Dir. of N.J. Div. of Alcoholic Beverage Control*, 133 F.4th 227, 235–36 (3d Cir. 2025);

## II.  Step Two: Legitimate Regulatory Basis

Because Arizona's licensing scheme is discriminatory, it would be invalid if applied to any product other than alcohol. *See Granholm*, 544 U.S. at 476; *Tennessee Wine*, 588 U.S. at 539. But § 2 of the Twenty-first Amendment may yet come to Arizona's rescue. Beyond repealing Prohibition, that Amendment preserved states' authority to regulate alcohol by prohibiting "[t]he transportation or importation into any State . . . for delivery or use therein of intoxicating liquors, in violation of the laws thereof." U.S. Const. amend. XXI § 2. Thus, notwithstanding the dormant Commerce Clause, a discriminatory regulation on alcohol is permissible if it is "justified as a public health or safety measure or on some other legitimate nonprotectionist ground." *Tennessee Wine*, 588 U.S. at 539.

However, "[w]here the predominant effect of a law is protectionism, not the protection of public health or safety, it is not shielded by § 2." *Id.* at 539–40. Not only must the ends be legitimate, but a State cannot employ discriminatory means unless "nondiscriminatory alternatives would be insufficient to further [its] interests." *Id.* at 540. Arizona must bring "concrete evidence" to the means-ends inquiry at *Tennessee Wine*'s second step; "mere speculation" and "unsupported assertions" will not do. *Id.* at 539–40 (quoting *Granholm*, 544 U.S. at 490, 492).

Some of our sister circuits sidestep imposing this evidentiary burden and hold that regulations essential to a state's three-tier system, including physical presence requirements, are per se legitimate. *See B-21 Wines*, 36 F.4th

---

*Chicago Wine Co. v. Braun*, -- F.4th --, 2025 WL 2218630, at *5–7 (7th Cir. Aug. 5, 2025) (Scudder, J., concurring in the judgment).

at 227–29; *Sarasota Wine Mkt., LLC v. Schmitt*, 987 F.3d 1171, 1180–84 (8th Cir. 2021); *Jean-Paul Weg, LLC v. Dir. of N.J. Div. of Alcoholic Beverage Control*, 133 F.4th 227, 239 (3d Cir. 2025). The majority joins them. I would not.

Our sister circuits that have adopted the per se validity rule for essential components of three-tier systems have grabbed at language in *Granholm* and *Tennessee Wine* calling that system "unquestionably legitimate." *See, e.g.*, *B-21*, 36 F.4th at 227 (quoting *Granholm*, 544 U.S. at 489) (citing *Tennessee Wine*, 588 U.S. at 534). As the Third Circuit recently reasoned, "if the system itself if constitutional, then the core features that define the system are also constitutional." *Jean-Paul Weg, LLC*, 133 F.4th at 239. The majority mimics this pattern. Maj. Op. 22 (quoting *Granholm*, 544 U.S. at 489).

If *Tennessee Wine* meant to create a carveout to its usual rule that states must produce concrete evidence that discriminatory regulations serve legitimate interests, it picked an exceedingly odd way to do so. In that case, the Court chastised the plaintiffs for "read[ing] far too much into *Granholm*'s discussion of the three-tiered model," particularly where *Granholm* did not concern "an essential feature of a three-tiered scheme." 588 U.S. at 535. Fresh off the Court's warning against overreading its discussions of the three-tier model, the majority and some of our sister circuits read *Tennessee Wine*'s discussion of this model to covertly create a new step two in the analysis by negative inference. *See B-21 Wines*, 36 F.4th at 234 (Wilkinson, J., dissenting) (criticizing this practice); *Chicago Wine Co. v. Braun*, -- F.4th --, 2025 WL 2218630, at *7–8 (7th Cir. Aug. 5, 2025) (Scudder, J., concurring in the judgment) (same). Under their reasoning, first we decide if the challenged law is discriminatory. Then we decide if it is essential to the

three-tier system. Only if we answer "yes" to the former and "no" to the latter would we reach the second (now third) part of the *Tennessee Wine* inquiry and examine whether concrete evidence shows that the regulation advances legitimate health or safety interests. *See, e.g.*, *Sarasota Wine*, 987 F.3d at 1183–84 (skipping "evidentiary weighing" for physical premise requirements that are essential to the three-tier system). As the majority states, "because the physical-premise requirement is [] an 'essential feature' of Arizona's three-tier system, we may uphold it without further determinations as to whether its predominant effect is to support public health and safety." Maj. Op. 24.

Rather than read that middle question into the Supreme Court's test, I would conduct the typical step-two analysis. Given the Supreme Court's flattering descriptions of the three-tier scheme, *e.g. Tennessee Wine*, 588 U.S. at 534–35, a regulation's central place in such a scheme may be powerful evidence of its legitimacy. But the three-tier system is ultimately a means to promote the public welfare, not an end in itself. The inquiry remains whether, based on "concrete evidence" rather than "speculation," a regulation promotes public health, safety, or another non-protectionist goal in a way that a nondiscriminatory regulation could not. *Id.* at 539–40; *accord Anvar v. Dwyer*, 82 F.4th 1, 9–11 (1st Cir. 2023); *Block v. Canepa*, 74 F.4th 400, 412–14 (6th Cir. 2023).

Of course, the majority is correct that the Twenty-first Amendment gives states power to regulate alcohol importation, Maj. Op. 24 n.6, but that power is not limitless—it must be exercised within the bounds of our constitutional order. And as Judge Wilkinson has noted, "some of what the Twenty-first Amendment appears to give, the Commerce Clause takes away." *B-21 Wines, Inc.*, 36

F.4th at 230 (Wilkinson, J., dissenting). Granting per se validity to the essential features of any three-tiered system a state chooses to adopt cedes more power to the states than they rightly have. *See id.* at 235 (explaining that beyond "vertical quarantine" of producers, wholesalers, and retailers, "there is no one archetypal three-tier system" and "each variation must be judged based on its own features") (citations omitted).

I also disagree with the majority that Arizona's residency-based shipping requirement is an essential feature of its three-tier system. The majority suggests that "allowing direct shipment from retailers without in-state premises functionally eliminates Arizona's control over the wholesale tier." Maj. Op. 24. That is plainly false. Again, as Judge Wilkinson explained:

> Prohibiting wine shipments to consumers from out-of-state retailers is no more essential to a three-tiered model than residency requirements. One can easily imagine a state maintaining a strict licensing regime to ensure that the tiers remain distinctly owned, while treating in-state and out-of-state retailers alike. . . .
>
> In no way is the three-tiered system jeopardized by a requirement of evenhandedness. Allowing imported wine does not necessitate allowing *unregulated* wine. Nothing stops [the state] from requiring out-of-state retailers to obtain a state shipping

> license and comply with the same conditions
> as in-state retailers.

*Id.* (citations omitted).

Moreover, in thinking about what is an essential feature of a three-tiered system, we must keep in mind that the dormant Commerce Clause only prohibits *discriminatory* regulations. How can we decide whether a regulation is essential without considering both sides of the coin—the favoritism for in-state retailers, coupled with the discrimination against out-of-state retailers? Even if I accepted that allowing out-of-state shipments would undercut Arizona's three-tier system, I would widen the aperture to consider whether Arizona's scheme that allows direct shipments from in-state but not out-of-state retailers is an essential part of its three-tier system. After all, it is the allowance of in-state shipments as much as the disallowance of out-of-state shipments that creates a dormant Commerce Clause problem. If Arizona's allowance for in-state shipments is not essential to its three-tier system, then its discrimination is not essential to its three-tier system. It could eliminate the in-state shipping allowance to cure its dormant Commerce Clause problem while doing no harm to its three-tier system.

For all these reasons, the majority errs in joining the Third, Fourth, and Eighth Circuits in applying a per se validity rule at step two of the *Tennessee Wine* analysis. Taking a hands-off approach to any "essential" feature of a three-tiered system adopted by a state abdicates our duty to uphold the Constitution.

Despite adopting a per se validity rule, the majority proceeds to explain that Arizona's residency-based shipping

requirement serves public health and safety, Maj. Op. 24–25, and that the availability of nondiscriminatory alternatives should be given limited weight in the public-health-and-safety analysis, *id.* 26. The discussion of these issues is superfluous to the court's holding and, therefore, is dicta. And I decline to address these issues even though they are not superfluous to my view of the case because the district court bypassed the requisite evidentiary weighing and relied on the residency-based shipping regulations' perceived centrality to Arizona's three-tier system. Accordingly, rather than wading into these fact-intensive issues on an incomplete record, I would remand for the district court to determine whether concrete evidence supports Arizona's contentions that limiting direct shipment privileges to retailers with in-state storefronts and Arizona managers advances the state's legitimate health and safety goals, and that nondiscriminatory regulations would be an inadequate substitute. *See Anvar*, 82 F.4th at 11 (remanding for the district court to conduct the appropriate evidentiary analysis); *Block*, 74 F.4th at 414 (same).

For these reasons, I respectfully dissent from Section II of the majority's analysis.